UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| COMMODITY FUTURES TRADING COMMISSION, | |
| Plaintiff, | Case Number 18-cv-3177 |
| v. | Judge _____ |
| ALGOINTERACTIVE INC, KEVIN P. WHYLIE, and MATTHEW JAMES ZECCHINI, | ECF Case |
| Defendants. | |

**COMPLAINT FOR INJUNCTIVE AND OTHER EQUITABLE RELIEF, RESTITUTION, AND CIVIL MONETARY PENALTIES UNDER THE COMMODITY EXCHANGE ACT**

Plaintiff, Commodity Futures Trading Commission ("CFTC" or "Commission"), by and through its attorneys, alleges as follows:

## I.   SUMMARY

1.      From approximately April 2016 through the present (the "Relevant Period"), Defendants Kevin P. Whylie ("Whylie") and Matthew James Zecchini ("Zecchini"), through their company, Defendant Algointeractive Inc ("Algointeractive") (together, "Defendants"), have engaged in a fraudulent scheme to solicit at least $300,000 from at least four members of the public to participate in a pooled investment vehicle for futures trading.  Rather than use participants' funds to trade, among other things, futures contracts, on behalf of the pool as promised, Defendants only traded a portion of pool participants' funds, misappropriated pool participants' funds, and issued false account statements to pool participants to conceal their trading losses and misappropriation.

2.      In furtherance of the fraudulent scheme, Defendants made material misstatements and omissions in solicitations to pool participants and prospective pool participants (hereinafter referred to collectively as "participants"), including misrepresenting their own background, experience, track record, and amount of assets under management, and misrepresenting that all or substantially all of the participants' funds would be pooled and invested in, among other things, futures contracts, for the participants' benefit.

3.      In reality, only a fraction of participants' funds was used to conduct futures trading for the pool.  Between April 2016 and May 2017, Defendants solicited $300,000 from four participants and deposited those funds into two bank accounts in the name of Algointeractive.  Only $55,000 of those funds was ever deposited into a futures trading account held by Algointeractive (the "Futures Trading Account"), which account suffered approximately $2,000 in trading losses.  Of the remaining pool participant funds, approximately $60,000 has been returned to pool participants.  Defendants have misappropriated the remainder of the funds for their own benefit, including by using participant funds to pay unauthorized personal or business expenses, including food, transportation, and entertainment.

4.      In order to perpetuate the fraud and conceal their trading losses and misappropriation, Defendants made and issued false documents, including monthly participant account statements and monthly expense charts, that inflated and misrepresented Algointeractive's assets and trading returns.  These false documents purported to reflect positive trading gains for the pool during periods of time when Algointeractive did not actually engage in any trading, or engaged in trading that was unprofitable.

5.      During the Relevant Period, Defendants also failed to operate their commodity pool as a separate legal entity—by receiving pool participant funds in a name other than that of

the pool, and by commingling pool funds with non-pool property—and failed to register with the Commission as a commodity pool operator ("CPO") and associated persons ("APs") of a CPO.

6.     By virtue of this conduct and the conduct further described herein, Defendants, either directly or as controlling persons, have engaged, are engaging, or are about to engage in acts and practices in violation of Sections 4b(a)(1)(A)-(C), 4k(2), 4m(1), and 4o(1)(A)-(B) of the Commodity Exchange Act (the "Act"), 7 U.S.C. §§ 6b(a)(1)(A)-(C), 6k(2), 6m(1), 6o(1)(A)-(B) (2012), and Commission Regulations ("Regulations") 4.20(a)-(c) and 4.41(a)-(b), 17 C.F.R. §§ 4.20(a)-(c), 4.41(a)-(b) (2017).

7.     The acts and omissions described herein were all done during the Relevant Period by Whylie, Zecchini, and other officers, employees or agents of Algointeractive in the scope of their employment or office at Algointeractive.  Therefore, Algointeractive is liable for all acts and omissions described herein, pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B) (2012), and Regulation 1.2, 17 C.F.R. § 1.2 (2017).

8.     Whylie and Zecchini were controlling persons of Algointeractive throughout the Relevant Period and did not act in good faith or knowingly induced Algointeractive's violations of the Act and Regulations described herein.  Therefore, Whylie and Zecchini are liable for Algointeractive's violations of the Act and Regulations, pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b) (2012).

9.     The Commission brings this action pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1 (2012), to enjoin Defendants' unlawful acts and practices and to compel their compliance with the Act and the Regulations promulgated thereunder.  In addition, the Commission seeks civil monetary penalties, and remedial ancillary relief, including, but not limited to, trading and registration bans, restitution, disgorgement, rescission, pre- and post-

judgment interest, and such other and further relief as the Court may deem necessary or appropriate.

10.     Unless restrained and enjoined by this Court, Defendants will likely continue to engage in acts and practices alleged in this Complaint and similar acts and practices, as described below.

## II.     JURISDICTION AND VENUE

11.     Section 6c(a) of the Act, 7 U.S.C. § 13a-1(a) (2012), authorizes the Commission to seek injunctive and other relief in United States district court against any person whenever it shall appear to the Commission that such person has engaged, is engaging, or is about to engage in any act or practice constituting a violation of any provision of the Act, or any rule, regulation, or order thereunder, and provides that district courts "shall have jurisdiction to entertain such actions."  This Court also has jurisdiction pursuant to 28 U.S.C. § 1331 (2012) (federal question) and 28 U.S.C. § 1345 (2012) (United States as plaintiff).

12.     Venue lies properly with this Court pursuant to Section 6c(e) of the Act because Defendants transacted business in this District, and certain transactions, acts, practices, and courses of business alleged in this Complaint occurred, are occurring, or are about to occur in this District.

## III.     THE PARTIES

13.     Plaintiff **Commission** is an independent federal regulatory agency charged by Congress with the administration and enforcement of the Act, 7 U.S.C. §§ 1-26 (2012), and the Regulations promulgated thereunder, 17 C.F.R. pt. 1–190 (2017).

14.     Defendant **Algointeractive** is a New York corporation, incorporated on or about November 4, 2015, under the name "Algointeractive Inc [sic]," with its last known place of

business at 260 Madison Ave., 8th Floor, New York, New York. Algointeractive has never been registered with the Commission in any capacity. On or about June 30, 2016, Algointeractive filed with the National Futures Association ("NFA") a notice pursuant to Regulation 4.13(b), 17 C.F.R. § 4.13(b) (2017), claiming that it was exempt from registration as a CPO and promising to operate its purported commodity pool, "Matthew Zecchini," NFA Pool ID P120142, in accordance with Regulation 4.13(a)(2). At or around the same time, Algointeractive also filed with NFA a notice pursuant to Regulation 4.14(a)(8)(i)(A)-(D), 17 C.F.R. § 4.14(a)(8)(i)(A)-(D) (2017), claiming to be exempt from registration as a commodity trading advisor. Algointeractive failed to affirm these notices of exemption as required by Regulations 4.13(b)(4) and 4.14(a)(8)(iii)(D), which in turn caused the claimed exemptions to be withdrawn effective March 2, 2017.

15.     Defendant **Whylie** is a co-founder, principal, director, and Chief Financial Officer of Algointeractive, and has also held himself out as the firm's Treasurer and Chief Operating Officer and head of the firm's trade desk. Whylie's last known residence is in Mamaroneck, New York. Whylie has never been registered with the Commission in any capacity.

16.     Defendant **Zecchini** is a co-founder, principal, chairman of the board of directors, and Chief Executive Officer of Algointeractive, and has also held himself out as Algointeractive's Chief Risk Officer and President. Zecchini's last known residence is in East Islip, New York. Zecchini has never been registered with the Commission in any capacity.

## IV.     FACTS

A.     Defendants' Purported "Algorithmic Hedge Fund"

17.     In 2015, Zecchini and Whylie co-founded an investment firm, which they incorporated as Algointeractive. At the time, Zecchini was an inactive college student who

worked as a pharmacy technician at Good Samaritan Hospital in West Islip, New York, and

Whylie was self-employed at Joe and Sons Enterprise, his family's moving and logistics

business, located at Whylie's home address in Mamaroneck.

18.     Zecchini recruited, as a third partner, an undergraduate computer science major

that Zecchini had met at college; this individual (hereinafter "Former CTO") served as

Algointeractive's Chief Technology Officer until he was terminated by Zecchini and Whylie in

approximately November 2016.

19.     Former CTO, who was the only Algointeractive partner with computer

programming skills, developed for the company an algorithm for trading futures contracts.  In

late 2015, Defendants unsuccessfully sought funding for Algointeractive by entering an

entrepreneurship competition, in which they described Algointeractive as offering algorithmic

trading services—specifically, a "scheduled event based trading platform"—to retail investors.

20.     Although Defendants sometimes represented that Algointeractive was also

investing in the "technology sector" as well as in pharmaceutical company securities (based on

Zecchini's purported expertise in evaluating "the probability of success for clinical trials

throughout the world"), Defendants primarily held Algointeractive out to the public in

promotional materials as an "algorithmic hedge fund" whose "Core Product" was Former CTO's

algorithm for trading futures contracts.  Defendants stated alternately that "all funds are invested

in exchange listed commodities" or that the firm was focused "almost entirely in the

commodities space."

21.     During the Relevant Period, at least four participants invested, in total, $300,000

in Algointeractive's purported hedge fund.  The first participant to provide funds to

Algointeractive ("Investor 1") invested a total of $50,000 between April 2016 and June 2016; the

second participant ("Investor 2") invested a total of $100,000 between July 2016 and September 2016; the third participant ("Investor 3") invested a total of $100,000 between February 2017 and April 2017; and the fourth participant ("Investor 4") invested $50,000 in May 2017. Participant funds were not held, or traded, by Defendants in separate participant accounts, but rather were pooled together.

22. Participants each invested with Algointeractive pursuant to written agreements by which Algointeractive promised to pay a fixed monthly return on each participant's principal investment, for a defined period of time, with Algointeractive retaining any excess returns. Under the agreements, participants could elect either to receive monthly dividends or to compound their returns by reinvesting the dividends with Algointeractive.  For some participants, the promised monthly rate of return was as high as five percent—i.e., nearly an eighty percent annual return on the participant's principal if he or she chose to reinvest monthly dividends with Algointeractive.

B.   Defendants' Fraudulent Solicitation and Misappropriation of Participant Funds

23. During the Relevant Period, Defendants, by and through their officers, employees, or agents, fraudulently solicited participants to invest in a commodity pool for futures trading, issued false account statements and other false and misleading materials to participants, and misappropriated participants' funds.  In furtherance of this fraudulent scheme, Defendants made misrepresentations and omissions to pool participants in written solicitations and correspondence sent via email as well as orally.

24. Defendants' fraudulent solicitations included misrepresentations by Defendants that all or substantially all of participants' funds would be pooled and used to invest in, among other things, futures trading to generate returns for participants.  For example, the cover page of

one written solicitation provided to pool participants by Defendants in or around March 2016

stated, in full:  "Algointeractive Investments:  Where your money is money being invested."

Such representations were false and misleading because, as described further below, Defendants

did not use, and had no intention to use, all or substantially all of participants' funds to trade

commodity futures for the benefit of participants, as promised, but rather began misappropriating

the majority of participants' funds for unauthorized personal and business expenses almost as

soon as the investments were received.

26.    Defendants also misled participants about the background and experience of

Algointeractive's principals.  For instance, a "Due Diligence Questionnaire" that Defendants

provided to pool participants, dated November 17, 2015, misleadingly stated that Zecchini had

eight years' experience in medical, mathematical, statistical, and trading related work, and that

Whylie had ten years' experience in equity, currency, commodity, and fixed income trading.

Separately, Zecchini told participants that he had developed specialized knowledge about

pharmaceutical and biotechnology while attending medical school, and Whylie told participants

that he was once a licensed securities broker.  In fact, Zecchini and Whylie were both college

dropouts who had no professional experience in finance or algorithmic trading.  Zecchini worked

as a pharmacy technician at Good Samaritan Hospital in West Islip, New York, and Whylie was

self-employed at his family's moving business.

26.    The due diligence questionnaire falsely stated that Algointeractive's principals

and/or management had invested a total of at least $500,000 in the company (or other investment

vehicles managed *pari passu* with the company).  In reality, the firm's three co-founding

principals—Zecchini, Whylie, and Former CTO—had invested no more than $15,000 total in the

company.

27. The due diligence questionnaire also falsely stated that "[t]otal assets managed/advised by" Algointeractive exceeded $500,000, with a largest current account of more than $150,000.  In fact, as of November 17, 2015, Algointeractive had not even opened a corporate bank account, and had no assets under management, and at no time did Algointeractive ever have any single customer with an interest in its commodity pool worth more than $150,000.

28. A later version of the questionnaire, dated November 11, 2016, falsely stated that Algointeractive had total assets under management of at least $1.5 million and more than $350,000 in the largest account.  In reality, Algointeractive never had more than approximately $300,000 total assets under management and never had a pool participant invest more than $100,000.  (Moreover, Algointeractive had represented to NFA on June 30, 2016, that pursuant to Regulation 4.13(a)(2)(ii), 17 C.F.R. § 4.13(a)(2)(ii) (2017), all commodity pools operated by Algointeractive would not have gross capital contributions in excess of $400,000 total.)

29. Defendants provided participants with a "Confidential Information Memorandum," dated August 2016, that was replete with misrepresentations.  The memorandum stated that Algointeractive's algorithm for trading futures was achieving profits on seventy percent of trades and thus generating "consistent returns."  The memorandum claimed:  "We achieve unparalleled returns: 5% per month to investors through our inaugural strategy, for twelve straight months."  The memorandum also claimed:  "We already have 6 individual investors, who we've made collectively over $250,000 since October 2015."

30. All of these statements were false.  As of August 2016, only two participants had invested in Algointeractive, not six; the firm's trading had not generated any positive returns for its participants, let alone $250,000; there was no month in which Algointeractive's trading had

achieved profits of five percent; and trades made using Defendants' algorithm were profitable only about half the time.

31.     The Confidential Information Memorandum also prominently advertised "Key Metrics" from Defendants' supposedly successful trading in an "Oct. 2014-2015 Backtest," including 49.8% "Total Returns," but lacked any disclaimer explaining that the memorandum was purporting to describe only simulated or hypothetical performance results that did not represent actual trading, or explaining the inherent limitations of such performance information.

32.     Defendants also provided participants with fictitious monthly charts, dated from at least November 2016 through May 2017, titled "Algointeractive's Operating Expenses," purporting to show Algointeractive's profitability.  The charts stated that Algointeractive had a "Starting Account" balance of over $452,000 in November 2016, and a "Net Account" balance that increased each month, reaching over $704,000 after the payment of May 2017 expenses; that Algointeractive achieved "Account Profits" of greater than $27,000 each month from November 2016 through May 2017, for a total of over $250,000 "Account Profits"; and that Algointeractive allocated at least $12,000 to "Investor Returns" in each of those months.  All of the figures in these charts were fabricated by Defendants for the purpose of defrauding participants.  As noted above, Algointeractive never had assets approaching $700,000, and never achieved profits approaching tens of thousands of dollars in a single month.

33.     In fact, Algointeractive never achieved any trading profits for pool participants.

34.     On April 7, 2016, Defendants deposited $5,000 of pool participant funds in a margin account they had opened for Algointeractive with an online stock broker.  In just a few weeks, trading stock and ETF options, they had lost all but approximately $20, and never traded again in the account after May 2016.

35.     Algointeractive also had one trading account with a futures commission merchant ("FCM 1")—i.e., the Futures Trading Account—that was active only from June 2016 through November 2016.  Defendants deposited $55,000 total of pool participant funds in the Futures Trading Account, and used those funds to trade stock options and futures, including crude oil futures and natural gas futures trading on NYMEX.  On balance, the Futures Trading Account was unprofitable, with total losses of approximately $2,000.  On November 3, 2016, Zecchini withdrew $52,800 from the Futures Trading Account, leaving an account balance in the Futures Trading Account of under $300 as of November 30, 2016.

36.     Any further trading in futures or options that Algointeractive may have done with pool participant funds was carried out with funds that Defendants had misappropriated and deposited into personal trading accounts held in the name and for the benefit of either Zecchini or Whylie without the knowledge or consent of participants.

37.     Zecchini deposited participant funds in at least one futures trading account in his own name at another futures commission merchant besides FCM 1 ("FCM 2"), and engaged in trading in that FCM 2 account between approximately October 2016 and August 2017, trading CME, NYMEX, CBOT, COMEX, and ICE futures contracts including Treasury bond, stock index, foreign currency, corn, soybean, gold, crude oil, and natural gas futures, and suffering over $62,000 in trading losses.

38.     Whylie deposited participant funds in at least one futures trading account in his own name, also with FCM 2, and engaged in trading in that account between approximately April 2016 and October 2016, trading CME, NYMEX, and CBOT futures contracts including stock index, foreign currency, corn, crude oil, and natural gas futures, and suffering over $1,000 in trading losses.

39.     Most of the $300,000 that participants invested with Algointeractive was misappropriated by Zecchini and Whylie, with over $200,000 total going to Zecchini and Whylie's personal bank accounts, and thousands of dollars more being misappropriated through the depletion of Algointeractive's bank accounts to pay unauthorized business and personal expenses, including the use of participants' principal to make dividend payments to other participants, in the manner of a Ponzi scheme.

40.     For instance, just one day after $50,000 from Investor 3 was deposited into a nearly empty Algointeractive bank account, Defendants used that same account to wire a $2,000 purported dividend payment to Investor 2.

41.     Zecchini and Whylie used Algointeractive's bank accounts to pay for unauthorized personal expenses ranging from MTA train tickets to fast food meals to clothing to high-end restaurant and hotel bills.

42.     Zecchini and Whylie also ran up thousands of dollars of credit card bills for Algointeractive, largely on personal expenses such as meals and transportation.  In or around May 2016, Whylie repeatedly attempted to misappropriate pool participant funds in Algointeractive's bank account to pay down these credit card bills, but the payments were declined for insufficient funds.

43.     Instead of using all or substantially all of participants' funds to trade, among other things, futures contracts, as promised, during the Relevant Period, Defendants misappropriated the majority of participants' funds for unauthorized purposes.  Zecchini and Whylie, through their control over Defendants' bank and trading accounts, personally misappropriated pool participants' funds for unauthorized personal or business expenses.  Defendants failed to disclose to participants that Defendants were not trading with all or substantially all participant funds as

was promised, and failed to disclose to participants that Defendants were in fact

misappropriating participant funds for unauthorized business and personal expenses.

44.     Zecchini and Whylie knew, or acted with reckless disregard of the fact, that pool

funds were being misappropriated and not being traded for the benefit of participants because

they controlled Algointeractive's and their own personal bank and trading accounts and engaged

in the misappropriation themselves.

C.     Defendants' Lies to Cover Up and Perpetuate the Fraud

45.     During the Relevant Period, in order to cover up and perpetuate their fraud,

Defendants willfully made, or caused to be made, false account statements and other documents

that inflated and misrepresented the value of participants' accounts and Algointeractive's trading

returns.

46.     Defendants did not disclose to participants that Algointeractive suffered trading

losses or that most of participants' funds invested with Algointeractive were actually

misappropriated rather than being used to trade for the benefit of participants.

47.     By making and issuing such account statements and other documents, Defendants

either willfully misrepresented or attempted to misrepresent material information to pool

participants, or willfully deceived or attempted to deceive pool participants, on multiple

occasions during the Relevant Period.

48.     Defendants provided participants with falsified account statements purporting to

show that funds were being allocated to individual participants within a trading account held at

FCM 2 in the name of Algointeractive, and that individual participants' investments were

performing profitably.  For instance, Defendants gave Investor 1 a document, dated December

31, 2016, purporting to be a monthly statement generated by FCM 2.  The document stated that

within an "Algointeractive Investments" account at FCM 2, Investor 1's December 2016

beginning balance was $65,827.60, that his account was credited $3,291.38 for "this month's

activity," and that his ending balance was $69,118.98.  However, there was never an account

opened in the name of Algointeractive or "Algointeractive Investments" at FCM 2 (Defendants

had applied for such an account but it was never opened); there was no Algointeractive account

at any futures commission merchant that generated trading profits during the month of December

2016; and Algointeractive never created customer subaccounts in the names of any of its pool

participants in any of the firm's trading or bank accounts.  The fictitious statement and others

like it for Investor 1 and other participants had actually been created by Whylie, who doctored

personal account statements he had received from FCM 2.

49.    Defendants told many other lies to pool participants in furtherance of their

fraudulent scheme.  For example, when Investor 2 asked for the return of a portion of her funds

in late 2016 or early 2017, pursuant to her three-month investment agreement with

Algointeractive dated September 1, 2016, Defendants concocted an elaborate hoax to avoid

repaying her.

50.    Initially, in early 2017, Zecchini told Investor 2 that the return of her funds was

being delayed due to anti-money-laundering policies newly implemented by NFA.  He claimed

that Defendants were writing letters to NFA and were scheduled to meet with NFA to resolve the

issue.  Zecchini later told Investor 2 that, at a second meeting with NFA, Zecchini had been

informed by NFA that Investor 2 was not an "accredited investor," that she had failed to pay

taxes on interest she had received, and that it was a "violation" for her to have entered into a

three-month investment contract in addition to one-year agreements she had previously made

with Algointeractive.  None of this was true.

51.     Next, Zecchini thereafter falsely told Investor 2 that her funds had been frozen because Algointeractive had to pay a fine to NFA.  After Investor 2 requested documentation of the fine, on March 9, 2017 Whylie sent Investor 2 a nonsensical two-page document that Whylie represented to Investor 2 was a letter from NFA, but in reality had been forged by Defendants. The undated letter contained the subject line "Request for Information Regarding Algo interactive (CTA)KEVIN P WHYLIE [sic]," but no salutation, and ended with the signature of an individual who was actually an executive of CME Group, not NFA.

52.     Zecchini and Whylie later met with Investor 2 at Algointeractive's office, where they repeated to her the false story that NFA had frozen her assets.

53.     Finally, Whylie falsely told Investor 2 that he had arranged for a meeting at NFA's New York office on July 26, 2017, in order to address the issue.  When Investor 2 arrived in the lobby of NFA's New York office at the appointed time, no one at NFA was aware of a meeting with Whylie having been scheduled, nor did Whylie know the name of the NFA staff member with whom he had supposedly arranged to meet.

54.     Even after Algointeractive's participants learned, in August 2017, of allegations from Former CTO that the firm had misappropriated their funds, Defendants continued to lie to participants in an attempt to perpetuate their fraud.

55.     In an August 7, 2017 email to participants, Former CTO stated accurately that, at the time of his departure from the firm in November 2016, Algointeractive had only received $150,000 total from just two investors; that pool participants' funds had been misappropriated by Defendants to pay various unauthorized expenses; that Defendants may have provided pool participants with altered account statements; and that Zecchini had falsely told one pool

participant (Investor 2) that Algointeractive could not return her investment because her funds had been frozen.

56.     On August 8, 2017, Investor 1 forwarded Former CTO's email to Zecchini, noting to Zecchini that Investor 1 had previously requested but had not received disbursement of over $82,000 in Investor 1's account (which Investor 1 noted should be available based on a June 2017 statement provided to Investor 1 purporting to show an account balance for Investor 1 of over $92,000), and asking Zecchini to confirm his assurances to Investor 1 that his funds would be immediately returned.  In an effort to perpetuate the fraud, Zecchini falsely responded to Investor 1 that Former CTO's allegations were "very shocking" and that Former CTO was "a complete liar" making "unsubstantiated claims with zero evidence whatsoever."

57.     On August 9, 2017, in an email to Investor 3, who had also received Former CTO's email, Zecchini, in an effort to perpetuate the fraud, accused Former CTO of misconduct and falsely dismissed him as a bitter former employee engaged in "scare tactics" and "allegations without any evidence what so ever."

58.     Only after Investor 1 demanded, on August 11, 2017, to see a current statement of his account with Algointeractive, did Zecchini finally begin to acknowledge the truth.  On August 12, 2017, Zecchini emailed Investor 1:  "I feel like my life is falling apart right now. . . . I'm doing my best to deal with everything but it's so overwhelming."  On August 14, 2017, after Investor 1 had declined Zecchini's invitation to meet in person, Zecchini responded by email:  "I feel horrible to put you in a position like this. . . . I realize that you are angry.  I've lost absolutely everything."

D.    Commingling of Funds and Failure to Register

59.    Defendants, while operating Algointeractive as a CPO, failed to operate their commodity pool as a legal entity separate from Algointeractive, received pool funds in the wrong name (i.e., in the name of Algointeractive), commingled pool funds with non-pool property, and failed to register with the Commission.

60.    During the Relevant Period, Defendants, by and through their officers, employees or agents, used the mails, emails, wire transfers, websites, and other means or instrumentalities of interstate commerce, to solicit participants.

61.    Algointeractive was never registered as a CPO.  During the Relevant Period, Algointeractive acted as a CPO by engaging in a business that is of the nature of a commodity pool and, in connection with that business, soliciting, receiving, or accepting pool funds from participants for the purpose of trading in commodity interests.

62.    During the Relevant Period, prior to approximately June 30, 2016, and again after March 1, 2017, Algointeractive acted as a CPO without registering as a CPO or claiming exemption from registration.  Defendants provided subscription agreements to pool participants both prior to June 30, 2016 and after March 1, 2017.

63.    On or about June 30, 2016, Whylie filed for Algointeractive a notice with NFA claiming that Algointeractive was exempt from registration as a CPO.  The notice represented that Algointeractive was a CPO operating one exempt commodity pool, and that the name of the pool was "Matthew Zecchini."

64.    On or about July 7, 2016, FCM 1 informed Zecchini by email that because a CPO is required to operate a pool as an entity separate from the CPO, and because Algointeractive's Futures Trading Account was in the name of Algointeractive, it was therefore improper for

Defendants to have identified Algointeractive to NFA as a CPO claiming to be exempt from registration. FCM 1 suggested that Zecchini should withdraw the notice of exemption as having been filed in error and file a new notice identifying himself as a CPO and Algointeractive as his pool.

65. Defendants did not take any action to correct the notice of exemption. Instead, Defendants continued to solicit and accept participant funds to be deposited in accounts in the name of the entity claiming to be an exempt CPO, i.e., Algointeractive.

66. Defendants did not affirm their notices of exemption within 60 days of the end of the year 2016, which caused their claimed exemptions to be deemed withdrawn by NFA, effective March 2, 2017.

67. Prior to delivering subscription agreements to participants during the Relevant Period, Defendants did not deliver to them any written statement that Algointeractive was exempt from registration as a CPO and therefore need not provide a disclosure document or certified annual report; nor did Defendants provide to participants any description of criteria pursuant to which Algointeractive qualified for exemption from registration.

68. As a result, Algointeractive was not eligible for the CPO registration exemption for which Whylie filed a notice of exemption, and Algointeractive was required to register as a CPO notwithstanding the notice of exemption filed with NFA.

69. Zecchini and Whylie acted as APs of a CPO by, in their capacity as partners, officers, employees, consultants, or agents of the CPO (Algointeractive), soliciting or supervising the solicitation of funds for participation in Algointeractive's pool, but they never registered with the Commission as such.

70.     Defendants' misappropriation of pool participants' funds, as detailed above, involved the commingling of pool property with their own property.  Zecchini, Whylie, and Former CTO each deposited their own funds in the Algointeractive bank accounts that were used to hold pool participant funds, and Zecchini and Whylie used those bank accounts to pay their own personal expenses.  Defendants also transferred money from Algointeractive's bank accounts into Zecchini and Whylie's existing personal bank accounts, again mixing pool property with their own property.

E.     Controlling Person Liability

71.     Throughout the Relevant Period, Whylie was chief financial officer and a principal and director of Algointeractive, and Zecchini was chief executive officer, chairman of the board of directors, and a principal of Algointeractive.

72.     Throughout the Relevant Period, Zecchini and Whylie directed and controlled all solicitations of participants.  At least two other individuals associated with Algointeractive— Former CTO and another person who was enlisted by Zecchini to assist with solicitations—took part in preparing materials used for solicitations and in communicating with participants, but in all cases Zecchini and/or Whylie supervised these individuals and dictated the content of the materials and substance of the representations about Algointeractive that were made to the participants.

73.     During the Relevant Period, Zecchini and Whylie were authorized signers on, and therefore had access to and control over, Algointeractive's bank accounts, and also were authorized traders with control over the Futures Trading Account and Algointeractive's online stock brokerage account.

74.     During the Relevant Period, Whylie and Zecchini did not act in good faith or knowingly induced Algointeractive and its officers, employees, or agents' violations of the Act and Regulations, by personally making or directing others to make the misrepresentations and omissions described above to participants, misappropriating or causing Algointeractive to misappropriate participants' funds, and operating or causing Algointeractive to commingle participants' funds and operate Algointeractive without proper registration.

75.     Whylie and Zecchini knew or recklessly disregarded the fact that Algointeractive and its officers, employees, or agents were making fraudulent solicitations and misrepresentations to participants, that participants were being given false account statements, that Defendants were misappropriating pool participant funds, and that Defendants were commingling participants' funds and operating Algointeractive without proper registration. Whylie and Zecchini failed to remove or correct the misrepresentations and failed to disclose the misappropriation of pool participant funds.

### V.     VIOLATIONS OF THE COMMODITY EXCHANGE ACT AND COMMISSION REGULATIONS

### COUNT ONE

### Violations of Section 4b(a)(1)(A)-(C) of the Act, 7 U.S.C. § 6b(a)(1)(A)-(C) (Fraud in Connection With Futures Contracts)

76.     Paragraphs 1 through 75 are realleged and incorporated herein by reference.

77.     Section 4b(a)(1)(A)-(C) of the Act, 7 U.S.C. § 6b(a)(1)(A)-(C) (2012), makes it unlawful:

> [F]or any person, in or in connection with any order to make, or the making of, any contract of sale of any commodity in interstate commerce or for future delivery that is made, or to be made, on or subject to the rules of a designated contract market, for or on behalf of any other person . . . (A) to cheat or defraud or attempt to cheat or defraud the other person; (B) willfully to make or cause to be made to the other person any false report or statement or

willfully to enter or cause to be entered for the other person any
false record; [or] (C) willfully to deceive or attempt to deceive the
other person by any means whatsoever in regard to any order or
contract or the disposition or execution of any order or contract, or
in regard to any act of agency performed, with respect to an order
or contract for or . . . with the other person.

78.     Defendants violated Section 4b(a)(1)(A)-(C) of the Act by willfully or recklessly

making false representations and omissions or otherwise defrauding participants, including but

not limited to by: (1) misrepresenting to participants that all or substantially all of participants'

funds would be pooled and used to invest in, among other things, futures contracts for the benefit

of participants; (2) misrepresenting to participants Defendants' background, experience, and

track record, the number of participants in Algointeractive's pool, and the amount of assets under

management by Defendants; (3) sending participants false account statements and other

documents that inflated and misrepresented the value of their accounts and the pool's trading

returns; (4) misrepresenting to one participant that her funds were unavailable for withdrawal

due to actions taken by NFA or government authorities; and (5) misappropriating participants'

funds for unauthorized personal or business expenses rather than investing for the benefit of

participants, and failing to disclose that participants' funds had been misappropriated.

79.     The foregoing acts, omissions, and failures by Whylie, Zecchini, and other

officers, employees, and agents of Algointeractive occurred within the scope of their

employment or office with Algointeractive.  Therefore, Algointeractive is liable for its officers,

employees, and agents' acts, omissions, and failures in violation of Section 4b(a)(1)(A)-(C) of

the Act pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B) (2012), and Regulation

1.2, 17 C.F.R. § 1.2 (2017).

80.     Whylie and Zecchini held and exercised direct and indirect control over

Algointeractive and either did not act in good faith or knowingly induced Algointeractive's

violations of Section 4b(a)(1)(A)-(C) of the Act.  As controlling persons of Algointeractive,

Whylie and Zecchini are liable for Algointeractive's violations of Section 4b(a)(1)(A)-(C) of the

Act pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b) (2012).

81.     Each misrepresentation, omission of material fact, false statement, and

misappropriation, including but not limited to those specifically alleged herein, is alleged as a

separate and distinct violation of Section 4b(a)(1)(A)-(C) of the Act.

## COUNT TWO

### Violations of Section 4*o*(1)(A)-(B) of the Act, 7 U.S.C. § 6*o*(1)(A)-(B)
### (Fraud and Deceit by a CPO and by APs of a CPO)

82.     Paragraphs 1 through 75 are re-alleged and incorporated herein by reference.

83.     During the Relevant Period, Algointeractive acted as a CPO, as defined by

Section 1a(11) of the Act, 7 U.S.C. § 1a(11) (2012), in that it engaged in a business that is of the

nature of an investment trust, syndicate, or similar form of enterprise, operated for the purpose of

trading in commodity interests and, in connection therewith, solicited, accepted, or received from

others, funds, securities, or property, either directly or through capital contributions, the sale of

stock or other forms of securities, or otherwise, for the purpose of trading in commodity

interests, including, in relevant part, commodities for future delivery.

84.     An AP of a CPO is defined by Regulation 1.3(aa)(3), 17 C.F.R. § 1.3(aa)(3)

(2017), as any person who is associated with a CPO as a partner, officer, employee, consultant,

or agent (or any natural person occupying a similar status or performing similar functions), in

any capacity which involves (i) the solicitation of funds, securities, or property for a participation

in a commodity pool or (ii) the supervision of any person or persons so engaged.  During the

Relevant Period, Whylie and Zecchini acted as APs of Algointeractive, in that each of them both

solicited funds for Algointeractive's pool and supervised other officers, employees, and agents of Algointeractive who solicited funds for Algointeractive's pool.

85.     Section 4$o$(1) of the Act, 7 U.S.C. § 6$o$(1) (2012), prohibits CPOs and APs of CPOs, whether registered with the Commission or not, from using the mails or any means or instrumentality of interstate commerce, directly or indirectly, from employing devices, schemes or artifices to defraud any client or participant or prospective client or participant, or engaging in transactions, practices, or courses of business which operate as a fraud or deceit upon any client or participant or prospective client or participant.

86.     While acting in its capacity as a CPO, Algointeractive, by and through its officers, employees, and agents, violated Section 4$o$(1) of the Act, 7 U.S.C. § 6$o$(1) (2012), by willfully or recklessly making false representations and omissions or otherwise defrauding participants or engaging in conduct that operated as a fraud or deceit on participants, including but not limited to by:  (1) misrepresenting to participants that all or substantially all of participants' funds would be pooled and used to invest in, among other things, futures contracts for the benefit of participants; (2) misrepresenting to participants Defendants' background, experience, and track record, the number of participants in Algointeractive's pool, and the amount of assets under management by Defendants; (3) sending participants false account statements and other documents that inflated and misrepresented the value of their accounts and the pool's trading returns; (4) misrepresenting to one participant that her funds were unavailable for withdrawal due to actions taken by NFA or government authorities; and (5) misappropriating pool participants' funds for unauthorized personal or business expenses rather than investing for the benefit of participants, and failing to disclose that participants' funds had been misappropriated.

87.     Whylie and Zecchini directly violated Section 4$o$(1)(A)-(B) of the Act, while acting in their capacity as APs of Algointeractive, by willfully or recklessly making false representations and omissions or otherwise defrauding participants or engaging in conduct that operated as a fraud or deceit on participants, including but not limited to by:  (1) misrepresenting to participants that all or substantially all of participants' funds would be pooled and used to invest in, among other things, futures contracts for the benefit of participants; (2) misrepresenting to participants Defendants' background, experience, and track record, the number of participants in Algointeractive's pool, and the amount of assets under management by Defendants; (3) sending participants false account statements and other documents that inflated and misrepresented the value of their accounts and the pool's trading returns; (4) misrepresenting to one participant that her funds were unavailable for withdrawal due to actions taken by NFA or government authorities; and (5) misappropriating participants' funds for unauthorized personal or business expenses rather than investing for the benefit of participants, and failing to disclose that participants' funds had been misappropriated.

88.     The foregoing acts, omissions, and failures by Whylie, Zecchini, and other officers, employees, and agents of Algointeractive occurred within the scope of their employment or office with Algointeractive.  Therefore, Algointeractive is liable for its officers, employees, and agents' acts, omissions, and failures in violation of Section 4$o$(1)(A)-(B) of the Act pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B) (2012), and Regulation 1.2, 17 C.F.R. § 1.2 (2017).

89.     Whylie and Zecchini held and exercised direct and indirect control over Algointeractive and either did not act in good faith or knowingly induced Algointeractive's violations of Section 4$o$(1)(A)-(B) of the Act.  As controlling persons of Algointeractive, Whylie

and Zecchini are liable for Algointeractive's violations of Section 4o(1)(A)-(B) of the Act

pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b) (2012).

90.    Each misrepresentation, omission of material fact, false statement, and

misappropriation, including but not limited to those specifically alleged herein, is alleged as a

separate and distinct violation of Section 4o(1) of the Act.

## **COUNT THREE**

### **Violations of Regulation 4.41(a)-(b), 17 C.F.R. § 4.41(a)-(b)** **(False Advertising and Failure to Include Hypothetical Disclaimer)**

91.    Paragraphs 1 through 75 are re-alleged and incorporated herein by reference.

92.    Regulation 4.41(a), 17 C.F.R. § 4.41(a) (2017), prohibits CPOs and their

principals from advertising in a manner that employs any device, scheme or artifice to defraud

any participant or client or prospective participant or client, or involves any transaction, practice

or course of business which operates as a fraud or deceit upon any participant or client or any

prospective participant or client.

93.    Regulation 4.41(b) prohibits any person from presenting the performance of any

simulated or hypothetical commodity interest account, transaction in a commodity interest or

series of transactions in a commodity interest of a commodity pool operator, commodity trading

advisor, or any principal thereof, unless such performance is accompanied either by a statement

prescribed by a registered futures association or by the following statement:

> These results are based on simulated or hypothetical performance
> results that have certain inherent limitations.  Unlike the results
> shown in an actual performance record, these results do not
> represent actual trading.  Also, because these trades have not
> actually been executed, these results may have under-or over-
> compensated for the impact, if any, of certain market factors, such
> as lack of liquidity.  Simulated or hypothetical trading programs in
> general are also subject to the fact that they are designed with the
> benefit of hindsight.  No representation is being made that any

account will or is likely to achieve profits or losses similar to these being shown.

94.     During the Relevant Period, while acting in its capacity as a CPO, Algointeractive, by and through its officers, employees, and agents, advertised using misrepresentations about, among other things, Defendants' background, experience, and track record, the number of participants in Algointeractive's pool, and the amount of assets under management by Defendants, as well as misrepresentations that all or substantially all of participants' funds would be pooled and used to invest for the benefit of participants.  Therefore, Algointeractive violated Regulation 4.41(a).

95.     Whylie and Zecchini directly violated Regulation 4.41(a) while acting in their capacity as principals of Algointeractive, by advertising using misrepresentations about, among other things, Defendants' background, experience, and track record, the number of participants in Algointeractive's pool, and the amount of assets under management by Defendants, as well as misrepresentations that all or substantially all of participants' funds would be pooled and used to invest for the benefit of participants.

96.     During the Relevant Period, Defendants, by and through their officers, employees, and agents, presented in written advertising statements about simulated or hypothetical commodity interest trading results achieved by Defendants that were not accompanied by any statement prescribed in Regulation 4.41(b).  Therefore, Defendants violated Regulation 4.41(b).

97.     Whylie and Zecchini held and exercised direct and indirect control over Algointeractive and either did not act in good faith or knowingly induced Algointeractive's violations of Regulation 4.41(a)-(b).  As controlling persons of Algointeractive, Whylie and Zecchini are liable for Algointeractive's violations of Regulation 4.41(a)-(b) pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b) (2012).

98.     The foregoing acts, omissions, and failures by Whylie, Zecchini, and other

officers, employees, and agents of Algointeractive occurred within the scope of their

employment or office with Algointeractive.  Therefore, Algointeractive is liable for its officers,

employees, and agents' acts, omissions, and failures in violation of Regulation 4.41(a)-(b)

pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B) (2012), and Regulation 1.2,

17 C.F.R. § 1.2 (2017).

### COUNT FOUR

### Violations of Sections 4m(1) and 4k(2) of the Act, 7 U.S.C. §§ 6m(1), 6k(2)
### (Failure to Register as a CPO and as APs of the CPO)

99.     Paragraphs 1 through 75 are re-alleged and incorporated herein by reference.

100.     Section 4m(1) of the Act, 7 U.S.C § 6m(1) (2012), makes it unlawful for any CPO

(subject to certain specified exceptions and exemptions, not applicable here), unless registered

with the Commission, to make use of the mails or any means or instrumentality of interstate

commerce in connection with its business as a CPO.

101.     Section 4k(2) of the Act, 7 U.S.C § 6k(2) (2012), requires all APs of CPOs

(subject to certain specified exceptions and exemptions, not applicable here) to be registered with

the Commission.

102.     During the Relevant Period, Algointeractive claimed exemption from registration

as a CPO only from June 30, 2016 until March 2, 2017, and did so only pursuant to Regulation

4.13(a)(2), 17 C.F.R. § 4.13(a)(2) (2017).

103.     Both prior to filing its notice of claimed exemption on or around June 30, 2016

and after its notice of claimed exemption was withdrawn by NFA on or around March 2, 2017,

Algointeractive operated as a CPO by soliciting, accepting, or receiving funds from participants

for the purpose of trading commodity futures contracts.

104.     Moreover, despite Algointeractive's claim that it was exempt from CPO registration requirements, at no time during the Relevant Period was Algointeractive eligible for exemption from registration under Regulation 4.13(a)(2), because prior to receiving subscription agreements Algointeractive's participants never received (a) any written statement that Algointeractive was exempt from registration as a CPO and therefore need not provide a disclosure document or certified annual report or (b) any description of criteria pursuant to which Algointeractive qualified for exemption from registration, as required by Regulation 4.13(a)(6)(i)-(ii).

105.     Likewise, at no time during the Relevant Period was Whylie or Zecchini eligible, pursuant to Regulation 3.12(h)(3)(ii), 17 C.F.R. § 3.12(h)(3)(ii) (2017), for exemption from the requirement to register as an AP of a CPO.

106.     During the Relevant Period, Algointeractive, while using the mails or means of interstate commerce (including email) in connection with its business as a CPO, was not registered with the Commission as a CPO.  Thus, Algointeractive acted as an unregistered CPO in violation of Section 4m(1) of the Act.

107.     During the Relevant Period, Whylie and Zecchini acted as APs of Algointeractive without registering with the Commission as APs of a CPO.  Thus, Whylie and Zecchini acted as unregistered APs of a CPO in violation of Section 4k(2) of the Act.

108.     Whylie and Zecchini held and exercised direct and indirect control over Algointeractive and either did not act in good faith or knowingly induced Algointeractive's violations of Section 4m(1) of the Act, 7 U.S.C. § 6m(1) (2012).  As controlling persons pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b) (2012), Whylie and Zecchini are liable for Algointeractive's violations of Section 4m(1) of the Act.

## COUNT FIVE

### Violation of Regulation 4.20(a)-(c), 17 C.F.R. § 4.20(a)-(c)
### (Failure To Operate Pool as Separate Entity, Failure To Receive Pool Participant Funds in Pool's Name; Commingling Pool Funds)

109.    Paragraphs 1 through 75 are re-alleged and incorporated herein by reference.

110.    Regulation 4.20(a), 17 C.F.R. § 4.20(a) (2017), requires a CPO, whether registered or not, to operate its commodity pool as an entity cognizable as a legal entity separate from the CPO.

111.    Regulation 4.20(b) prohibits CPOs, whether registered or not, from receiving pool participants' funds in any name other than that of the pool.

112.    Regulation 4.20(c) prohibits a CPO, whether registered or not, from commingling the property of any pool it operates with the property of any other person.

113.    During the Relevant Period, Algointeractive, while acting as a CPO, violated Regulation 4.20(a)-(c) by: (1) failing to operate its commodity pool as a legal entity separate from Algointeractive; (2) failing to receive pool participants' funds in the name of a pool that was a legal entity separate from itself; and (3) commingling the property of the pool with property of Defendants or others.

114.    Whylie and Zecchini held and exercised direct and indirect control over Algointeractive and either did not act in good faith or knowingly induced Algointeractive's violations of Regulation 4.20(a)-(c).  As controlling persons of Algointeractive, Whylie and Zecchini are liable for Algointeractive's violations of Regulation 4.20(a)-(c) pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b) (2012).

## VI.    RELIEF REQUESTED

WHEREFORE, the Commission respectfully requests that this Court, as authorized by Section 6c of the Act, 7 U.S.C. § 13a-1 (2012), and pursuant to its own equitable powers:

A.      Enter an order finding that Defendants violated Sections 4b(a)(1)(A)-(C), 4m(1), and 4o(1)(A)-(B) of the Act, 7 U.S.C. §§ 6b(a)(1)(A)-(C), 6m(1), 6o(1)(A)-(B) (2012), and Regulations 4.20(a)-(c) and 4.41(a)-(b), 17 C.F.R. §§ 4.20(a)-(c), 4.41(a)-(b) (2017);

B.      Enter an order finding that Defendants Whylie and Zecchini additionally violated Section 4k(2) of the Act, 7 U.S.C. § 6k(2) (2012);

C.      Enter an order of permanent injunction restraining, enjoining and prohibiting Defendants and any other person or entity in active concert with them, from engaging in conduct in violation of Sections 4b(a)(1)(A)-(C), 4m(1), and 4o(1)(A)-(B) of the Act, and Regulations 4.20(a)-(c) and 4.41(a)-(b);

D.      Enter an order of permanent injunction additionally restraining, enjoining and prohibiting Defendants Whylie and  Zecchini, and any other person or entity in active concert with them, from engaging in conduct in violation of Section 4k(2) of the Act;

E.      Enter an order of permanent injunction prohibiting Defendants and any other person or entity in active concert with them from, directly or indirectly:

    1)  Trading on or subject to the rules of any registered entity (as that term is defined by Section 1a(40) of the Act, 7 U.S.C. § 1a(40) (2012));

    2)  Entering into any transactions involving "commodity interests" (as that term is defined in Regulation 1.3(yy), 17 C.F.R. § 1.3(yy) (2017)), for accounts held in the name of any Defendant or for accounts in which any Defendant has a direct or indirect interest;

    3)  Having any commodity interests traded on any Defendant's behalf;

4)  Controlling or directing the trading for or on behalf of any other person or entity, whether by power of attorney or otherwise, in any account involving commodity interests;

5)  Soliciting, receiving, or accepting any funds from any person for the purpose of purchasing or selling of any commodity interests;

6)  Applying for registration or claiming exemption from registration with the CFTC in any capacity, and engaging in any activity requiring such registration or exemption from registration with the CFTC except as provided for in Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9) (2017); and

7)  Acting as a principal (as that term is defined in Regulation 3.1(a), 17 C.F.R. § 3.1(a) (2017)), agent, or any other officer or employee of any person registered, exempted from registration, or required to be registered with the CFTC except as provided for in Regulation 4.14(a)(9);

F.  Enter an order requiring Defendants, as well as any of their successors, to disgorge to any officer appointed by the Court all benefits received from acts or practices that constitute violations of the Act, as amended, and Regulations as described herein, including, but not limited to, salaries, commissions, loans, fees, revenues, and trading profits derived, directly or indirectly, plus pre-judgment interest thereon from the date of such violations, plus post-judgment interest;

G.  Enter an order requiring Defendants, as well as their successors, to make full restitution, pursuant to such procedure as the Court may order, to every person or entity who sustained losses proximately caused by Defendants' violations (in the amount of such losses), as

described herein, plus pre-judgment interest thereon from the date of such violations, plus post-judgment interest;

H.      Enter an order directing Defendants and any of their successors, to rescind, pursuant to such procedures as the Court may order, all contracts and agreements, whether implied or express, entered into between them and any of the customers whose funds were received by them as a result of the acts and practices which constituted violations of the Act, as amended, as described herein;

I.      Enter an order directing each Defendant to pay a civil monetary penalty, to be assessed by the Court, in an amount not to exceed the penalty prescribed by Section 6c(d)(1) of the Act, 7 U.S.C. § 13a-1(d)(1) (2012), as adjusted for inflation pursuant to the Federal Civil Penalties Inflation Adjustment Act Improvements Act of 2015, Pub. L. 114-74, 129 Stat. 584 (2015), title VII, Section 701, *see* Regulation 143.8, 17 C.F.R. § 143.8 (2017), for each violation of the Act and Regulations, as described herein;

J.      Enter an order directing that Defendants, and any successors thereof, make an accounting to the Court of all of their assets and liabilities, together with all funds they received from and paid to investors and other persons in connection with commodity interests and all disbursements for any purpose whatsoever of funds received from commodity interests, including salaries, commissions, interest, fees, loans, and other disbursement of money or property of any kind from at least April 2016 to the date of such accounting;

K.      Enter an order requiring Defendants to pay costs and fees as permitted by 28 U.S.C. §§ 1920 and 2413(a)(2) (2012); and

L.      Enter an order providing such other and further relief as this Court may deem necessary and appropriate under the circumstances.

April 11, 2018

Respectfully submitted,

COMMODITY FUTURES TRADING
COMMISSION


By: s/ David C. Newman
    David C. Newman
    Senior Trial Attorney
    dnewman@cftc.gov
    (646) 746-9740

    R. Stephen Painter, Jr., *pro hac vice pending*
    Chief Trial Attorney
    spainter@cftc.gov

    Manal M. Sultan
    Deputy Director
    msultan@cftc.gov

    Commodity Futures Trading Commission
    Division of Enforcement
    140 Broadway, 19th floor
    New York, NY 10005
    Phone: (646) 746-9700
    Fax: (646) 746-9940