UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK



COMMODITY FUTURES TRADING
COMMISSION,

                              Plaintiff,

v.

ALGOINTERACTIVE INC, KEVIN P. WHYLIE,
and MATTHEW JAMES ZECCHINI,

                              Defendants.

Case No. 18-cv-3177-LAP-KNF

[PROPOSED] ORDER AND
DEFAULT JUDGMENT AGAINST
DEFENDANTS ALGOINTERACTIVE
INC AND MATTHEW JAMES
ZECCHINI

## I.  INTRODUCTION

This matter is before the Court upon Plaintiff Commodity Futures Trading Commission's

application for default judgment pursuant to Rule 55(b)(2) of the Federal Rules of Civil

Procedure ("FRCP") and Local Civil Rule 55.2(b) of the Local Rules of the United States

District Courts for the Southern and Eastern Districts of New York ("Local Rule 55.2(b)").

On April 11, 2018, Plaintiff Commodity Futures Trading Commission ("Plaintiff" or the

"Commission") filed its Complaint for Injunctive and Other Equitable Relief, Restitution, and

Civil Monetary Penalties under the Commodity Exchange Act (the "Complaint" or "Compl.")

against Defendants Algointeractive Inc ("Algointeractive"), Kevin P. Whylie ("Whylie"), and

Matthew James Zecchini ("Zecchini").  (ECF No. 1.)  On April 17, 2018, Zecchini was served

with the summons and Complaint; on April 18, 2018, Algointeractive was served with the

summons and Complaint; and the Commission filed proof of service on both Algointeractive and

Zecchini (collectively, "Defaulting Defendants") on April 23, 2018.  (ECF Nos. 10, 12.)

Defaulting Defendants failed to answer or otherwise move with respect to the Complaint, and the

Clerk of Court entered their default on May 25, 2018.  (ECF No. 16.)  Pursuant to Rule 2.F of

1

this Court's Individual Practices, the Commission made an application, by order to show cause, for default judgment against Defaulting Defendants.

Upon the Commission's application, and having carefully considered the Complaint (the allegations of which are well-pleaded and hereby taken as true), the declaration of counsel for the Commission in support of the application and exhibits thereto, and other written submissions filed with the Court, and being fully advised in the premises, pursuant to FRCP 55(b)(2) and Local Rule 55.2(b), it is hereby **ORDERED AND ADJUDGED** that:

Plaintiff's application be and the same is hereby **GRANTED**; and

Pursuant to FRCP 55 and 58, Default Judgment be and the same is hereby **ENTERED** in favor of Plaintiff and against Defendants Algointeractive and Zecchini.

Accordingly, the Court enters the following findings of fact and conclusions of law and orders the following relief:

## II.      FINDINGS OF FACT

**A.      Summary**

1.      From approximately April 2016 through April 11, 2018 (the "Relevant Period"), Zecchini, through his company, Algointeractive, engaged in a fraudulent scheme to solicit at least $300,000 from at least four members of the public to participate in a pooled investment vehicle for futures trading. Rather than use participants' funds to trade, among other things, futures contracts, on behalf of the pool as promised, Defaulting Defendants only traded a portion of pool participants' funds, misappropriated pool participants' funds, and issued false account statements to pool participants to conceal their trading losses and misappropriation. (Compl. ¶ 1.)

2.      In furtherance of the fraudulent scheme, Defaulting Defendants made material misstatements and omissions in solicitations to pool participants and prospective pool participants (hereinafter referred to collectively as "participants"), including misrepresenting their own background, experience, track record, and amount of assets under management, and misrepresenting that all or substantially all of the participants' funds would be pooled and invested in, among other things, futures contracts, for the participants' benefit. (Compl. ¶ 2.)

3.      In reality, only a fraction of participants' funds was used to conduct futures trading for the pool. Between April 2016 and May 2017, Defaulting Defendants solicited $300,000 from four participants and deposited those funds into two bank accounts in the name of Algointeractive. Only $55,000 of those funds was ever deposited into a futures trading account held by Algointeractive (the "Futures Trading Account"), which account suffered approximately $2,000 in trading losses. Of the remaining pool participant funds, only $59,450 has been returned to pool participants. Defaulting Defendants have misappropriated the remainder of the funds for their own benefit, including by using participant funds to pay unauthorized personal or business expenses, including food, transportation, and entertainment. (Compl. ¶ 3; Decl. of Trevor Kokal ("Kokal Decl.") ¶ 6.)

4.      In order to perpetuate the fraud and conceal their trading losses and misappropriation, Defaulting Defendants made and issued false documents, including monthly participant account statements and monthly expense charts, that inflated and misrepresented Algointeractive's assets and trading returns. These false documents purported to reflect positive trading gains for the pool during periods of time when Algointeractive did not actually engage in any trading, or engaged in trading that was unprofitable. (Compl. ¶ 4.)

5.     During the Relevant Period, Defaulting Defendants also failed to operate their commodity pool as a separate legal entity—by receiving pool participant funds in a name other than that of the pool, and by commingling pool funds with non-pool property—and failed to register with the Commission as a commodity pool operator ("CPO") and associated person ("AP") of a CPO.  (Compl. ¶ 5.)

**B.     The Parties**

6.     Plaintiff Commission is an independent federal regulatory agency charged by Congress with the administration and enforcement of the Commodity Exchange Act (the "Act" or "CEA"), 7 U.S.C. §§ 1-26 (2012), and Commission Regulations ("Regulations") promulgated thereunder, 17 C.F.R. pts. 1–190 (2018).  (Compl. ¶ 13.)

7.     Defendant Algointeractive is a New York corporation, incorporated on or about November 4, 2015, under the name "Algointeractive Inc [sic]," with its last known place of business at 260 Madison Ave., 8th Floor, New York, New York.  Algointeractive has never been registered with the Commission in any capacity.  On or about June 30, 2016, Algointeractive filed with the National Futures Association ("NFA") a notice pursuant to Regulation 4.13(b), 17 C.F.R. § 4.13(b) (2018), claiming that it was exempt from registration as a CPO and promising to operate its purported commodity pool, "Matthew Zecchini," NFA Pool ID P120142, in accordance with Regulation 4.13(a)(2).  At or around the same time, Algointeractive also filed with NFA a notice pursuant to Regulation 4.14(a)(8)(i)(A)-(D), 17 C.F.R. § 4.14(a)(8)(i)(A)-(D) (2018), claiming to be exempt from registration as a commodity trading advisor.  Algointeractive failed to affirm these notices of exemption as required by Regulations 4.13(b)(4) and 4.14(a)(8)(iii)(D), which in turn caused the claimed exemptions to be withdrawn effective March 2, 2017.  (Compl. ¶ 14.)

8.      Defendant Zecchini is a co-founder, principal, chairman of the board of directors, and Chief Executive Officer of Algointeractive, and has also held himself out as Algointeractive's Chief Risk Officer and President.  Zecchini's last known residence is in East Islip, New York.  Zecchini has never been registered with the Commission in any capacity. (Compl. ¶ 16.)

**C.      Defaulting Defendants' Purported "Algorithmic Hedge Fund"**

9.      In 2015, Zecchini co-founded an investment firm, which was incorporated as Algointeractive.  At the time, Zecchini was an inactive college student who worked as a pharmacy technician at Good Samaritan Hospital in West Islip, New York.  (Compl. ¶ 17.)

10.      Zecchini recruited, as an additional partner, an undergraduate computer science major that Zecchini had met at college; this individual (hereinafter "Former CTO") served as Algointeractive's Chief Technology Officer until he was terminated by Defaulting Defendants in approximately November 2016.  (Compl. ¶ 18.)

11.      Former CTO, who was the only Algointeractive partner with computer programming skills, developed for the company an algorithm for trading futures contracts.  In late 2015, Defaulting Defendants unsuccessfully sought funding for Algointeractive by entering an entrepreneurship competition, in which they described Algointeractive as offering algorithmic trading services—specifically, a "scheduled event based trading platform"—to retail investors. (Compl. ¶ 19.)

12.      Although Defaulting Defendants sometimes represented that Algointeractive was also investing in the "technology sector" as well as in pharmaceutical company securities (based on Zecchini's purported expertise in evaluating "the probability of success for clinical trials throughout the world"), Defaulting Defendants primarily held Algointeractive out to the public

in promotional materials as an "algorithmic hedge fund" whose "Core Product" was Former
CTO's algorithm for trading futures contracts. Defaulting Defendants stated alternately that "all
funds are invested in exchange listed commodities" or that the firm was focused "almost entirely
in the commodities space." (Compl. ¶ 20.)

13.     During the Relevant Period, at least four participants invested, in total, $300,000
in Algointeractive's purported hedge fund. The first participant to provide funds to
Algointeractive ("Investor 1") invested a total of $50,000 between April 2016 and June 2016; the
second participant ("Investor 2") invested a total of $100,000 between July 2016 and September
2016; the third participant ("Investor 3") invested a total of $100,000 between February 2017
and April 2017; and the fourth participant ("Investor 4") invested $50,000 in May 2017.
Participant funds were not held, or traded, by Defaulting Defendants in separate participant
accounts, but rather were pooled together. (Compl. ¶ 21; Kokal Decl. ¶ 6(a).)

14.     Participants each invested with Algointeractive pursuant to written agreements by
which Algointeractive promised to pay a fixed monthly return on each participant's principal
investment, for a defined period of time, with Algointeractive retaining any excess returns.
Under the agreements, participants could elect either to receive monthly dividends or to
compound their returns by reinvesting the dividends with Algointeractive. For some
participants, the promised monthly rate of return was as high as five percent—i.e., nearly an
eighty percent annual return on the participant's principal if he or she chose to reinvest monthly
dividends with Algointeractive. (Compl. ¶ 22.)

**D.     Defaulting Defendants' Fraudulent Solicitation
        and Misappropriation of Participant Funds**

15.     During the Relevant Period, Defaulting Defendants, by and through their officers,
employees, or agents, fraudulently solicited participants to invest in a commodity pool for

6

futures trading, issued false account statements and other false and misleading materials to participants, and misappropriated participants' funds. In furtherance of this fraudulent scheme, Defaulting Defendants made misrepresentations and omissions to pool participants in written solicitations and correspondence sent via email as well as orally. (Compl. ¶ 23.)

16.     Defaulting Defendants' fraudulent solicitations included misrepresentations by Defaulting Defendants that all or substantially all of participants' funds would be pooled and used to invest in, among other things, futures trading to generate returns for participants. For example, the cover page of one written solicitation provided to pool participants by Defaulting Defendants in or around March 2016 stated, in full: "Algointeractive Investments: Where your money is money being invested." Such representations were false and misleading because, as described further below, Defaulting Defendants did not use, and had no intention to use, all or substantially all of participants' funds to trade commodity futures for the benefit of participants, as promised, but rather began misappropriating the majority of participants' funds for unauthorized personal and business expenses almost as soon as the investments were received. (Compl. ¶ 24.)

17.     Defaulting Defendants also misled participants about the background and experience of Algointeractive's principals. For instance, a "Due Diligence Questionnaire" that Defaulting Defendants provided to pool participants, dated November 17, 2015, misleadingly stated that Zecchini had eight years' experience in medical, mathematical, statistical, and trading related work, and that Whylie had ten years' experience in equity, currency, commodity, and fixed income trading. Separately, Zecchini told participants that he had developed specialized knowledge about pharmaceutical and biotechnology while attending medical school. In fact,

Zecchini and Whylie were both college dropouts who had no professional experience in finance or algorithmic trading.  (Compl. ¶ 25.)

18.     The due diligence questionnaire falsely stated that Algointeractive's principals and/or management had invested a total of at least $500,000 in the company (or other investment vehicles managed *pari passu* with the company).  In reality, the firm's three co-founding principals had invested no more than $15,000 total in the company.  (Compl. ¶ 26.)

19.     The due diligence questionnaire also falsely stated that "[t]otal assets managed/advised by" Algointeractive exceeded $500,000, with a largest current account of more than $150,000.  In fact, as of November 17, 2015, Algointeractive had not even opened a corporate bank account, and had no assets under management, and at no time did Algointeractive ever have any single customer with an interest in its commodity pool worth more than $150,000. (Compl. ¶ 27.)

20.     A later version of the questionnaire, dated November 11, 2016, falsely stated that Algointeractive had total assets under management of at least $1.5 million and more than $350,000 in the largest account.  In reality, Algointeractive never had more than approximately $300,000 total assets under management and never had a pool participant invest more than $100,000. (Moreover, Algointeractive had represented to NFA on June 30, 2016, that pursuant to Regulation 4.13(a)(2)(ii), 17 C.F.R. § 4.13(a)(2)(ii) (2018), all commodity pools operated by Algointeractive would not have gross capital contributions in excess of $400,000 total.)  (Compl. ¶ 28.)

21.     Defaulting Defendants provided participants with a "Confidential Information Memorandum," dated August 2016, that was replete with misrepresentations.  The memorandum stated that Algointeractive's algorithm for trading futures was achieving profits on seventy

percent of trades and thus generating "consistent returns." The memorandum claimed: "We achieve unparalleled returns: 5% per month to investors through our inaugural strategy, for twelve straight months." The memorandum also claimed: "We already have 6 individual investors, who we've made collectively over $250,000 since October 2015." (Compl. ¶ 29.)

22. All of these statements were false. As of August 2016, only two participants had invested in Algointeractive, not six; the firm's trading had not generated any positive returns for its participants, let alone $250,000; there was no month in which Algointeractive's trading had achieved profits of five percent; and trades made using Algointeractive's algorithm were profitable only about half the time. (Compl. ¶ 30.)

23. The Confidential Information Memorandum also prominently advertised "Key Metrics" from Algointeractive's supposedly successful trading in an "Oct. 2014-2015 Backtest," including 49.8% "Total Returns," but lacked any disclaimer explaining that the memorandum was purporting to describe only simulated or hypothetical performance results that did not represent actual trading, or explaining the inherent limitations of such performance information. (Compl. ¶ 31.)

24. Defaulting Defendants also provided participants with fictitious monthly charts, dated from at least November 2016 through May 2017, titled "Algointeractive's Operating Expenses," purporting to show Algointeractive's profitability. The charts stated that Algointeractive had a "Starting Account" balance of over $452,000 in November 2016, and a "Net Account" balance that increased each month, reaching over $704,000 after the payment of May 2017 expenses; that Algointeractive achieved "Account Profits" of greater than $27,000 each month from November 2016 through May 2017, for a total of over $250,000 "Account Profits"; and that Algointeractive allocated at least $12,000 to "Investor Returns" in each of

9

those months. All of the figures in these charts were fabricated by Defaulting Defendants for the purpose of defrauding participants. As noted above, Algointeractive never had assets approaching $700,000, and never achieved profits approaching tens of thousands of dollars in a single month. (Compl. ¶ 32.)

25.     In fact, Algointeractive never achieved any trading profits for pool participants. (Compl. ¶ 33.)

26.     On April 7, 2016, Defaulting Defendants deposited $5,000 of pool participant funds in a margin account they had opened for Algointeractive with an online stock broker. In just a few weeks, trading stock and ETF options, they had lost all but approximately $20, and never traded again in the account after May 2016. (Compl. ¶ 34.)

27.     Algointeractive also had one trading account with a futures commission merchant ("FCM 1")—i.e., the Futures Trading Account—that was active only from June 2016 through November 2016. Defaulting Defendants deposited $55,000 total of pool participant funds in the Futures Trading Account, and used those funds to trade stock options and futures, including crude oil futures and natural gas futures trading on NYMEX. On balance, the Futures Trading Account was unprofitable, with total losses of approximately $2,000. On November 3, 2016, Zecchini withdrew $52,800 from the Futures Trading Account, leaving an account balance in the Futures Trading Account of under $300 as of November 30, 2016. (Compl. ¶ 35.)

28.     Any further trading in futures or options that Algointeractive may have done with pool participant funds was carried out with funds that Defaulting Defendants had misappropriated and deposited into personal trading accounts held in the name and for the benefit of one of Algointeractive's principals, including Zecchini, without the knowledge or consent of participants. (Compl. ¶ 36.)

29.     Zecchini deposited participant funds in at least one futures trading account in his own name at another futures commission merchant besides FCM 1 ("FCM 2"), and engaged in trading in that FCM 2 account between approximately October 2016 and August 2017, trading CME, NYMEX, CBOT, COMEX, and ICE futures contracts including Treasury bond, stock index, foreign currency, corn, soybean, gold, crude oil, and natural gas futures, and suffering over $62,000 in trading losses.  (Compl. ¶ 37.)

30.     Participant funds were deposited in at least one other futures trading account in the name of one of Algointeractive's principals, also with FCM 2, and that account engaged in trading between approximately April 2016 and October 2016, trading CME, NYMEX, and CBOT futures contracts including stock index, foreign currency, corn, crude oil, and natural gas futures, and suffering over $1,000 in trading losses.  (Compl. ¶ 38.)

31.     Most of the $300,000 that participants invested with Algointeractive was misappropriated by Defaulting Defendants, with over $200,000 going to personal bank accounts in the name of Algointeractive's principals, including Zecchini, and thousands of dollars more being misappropriated through the depletion of Algointeractive's bank accounts to pay unauthorized business and personal expenses, including the use of participants' principal to make dividend payments to other participants, in the manner of a Ponzi scheme.  (Compl. ¶ 39.)

32.     For instance, just one day after $50,000 from Investor 3 was deposited into a nearly empty Algointeractive bank account, Defaulting Defendants used that same account to wire a $2,000 purported dividend payment to Investor 2.  (Compl. ¶ 40.)

33.     Zecchini used Algointeractive's bank accounts to pay for unauthorized personal expenses ranging from MTA train tickets to restaurant bills.  (Compl. ¶ 41.)

34.    Defaulting Defendants also ran up thousands of dollars of credit card bills for Algointeractive, largely on personal expenses such as meals and transportation.  (Compl. ¶ 42.)

35.    Instead of using all or substantially all of participants' funds to trade, among other things, futures contracts, as promised, during the Relevant Period, Defaulting Defendants misappropriated the majority of participants' funds for unauthorized purposes.  Through his control over Defendants' bank and trading accounts, Zecchini personally misappropriated pool participants' funds for unauthorized personal or business expenses.  Defaulting Defendants failed to disclose to participants that they were not trading with all or substantially all participant funds as was promised, and failed to disclose to participants that Defaulting Defendants were in fact misappropriating participant funds for unauthorized business and personal expenses.  (Compl. ¶ 43.)

36.    Zecchini knew, or acted with reckless disregard of the fact, that pool funds were being misappropriated and not being traded for the benefit of participants because he controlled Algointeractive's and his own personal bank and trading accounts and engaged in the misappropriation himself.  (Compl. ¶ 44.)

**E.    Defaulting Defendants' Lies to Cover Up and Perpetuate the Fraud**

37.    During the Relevant Period, in order to cover up and perpetuate their fraud, Defaulting Defendants willfully made, or caused to be made, false account statements and other documents that inflated and misrepresented the value of participants' accounts and Algointeractive's trading returns.  (Compl. ¶ 45.)

38.    Defaulting Defendants did not disclose to participants that Algointeractive suffered trading losses or that most of participants' funds invested with Algointeractive were actually misappropriated rather than being used to trade for the benefit of participants.  (Compl. ¶ 46.)

39.     By making and issuing such account statements and other documents, Defaulting

Defendants either willfully misrepresented or attempted to misrepresent material information to

pool participants, or willfully deceived or attempted to deceive pool participants, on multiple

occasions during the Relevant Period.  (Compl. ¶ 47.)

40.     Defaulting Defendants provided participants with falsified account statements

purporting to show that funds were being allocated to individual participants within a trading

account held at FCM 2 in the name of Algointeractive, and that individual participants'

investments were performing profitably.  For instance, Defaulting Defendants gave Investor 1 a

document, dated December 31, 2016, purporting to be a monthly statement generated by FCM 2.

The document stated that within an "Algointeractive Investments" account at FCM 2,

Investor 1's December 2016 beginning balance was $65,827.60, that his account was credited

$3,291.38 for "this month's activity," and that his ending balance was $69,118.98.  However,

there was never an account opened in the name of Algointeractive or "Algointeractive

Investments" at FCM 2 (Defaulting Defendants had applied for such an account but it was never

opened); there was no Algointeractive account at any futures commission merchant that

generated trading profits during the month of December 2016; and Algointeractive never created

customer subaccounts in the names of any of its pool participants in any of the firm's trading or

bank accounts.  The fictitious statement and others like it for Investor 1 and other participants

were doctored versions of personal account statements received from FCM 2.  (Compl. ¶ 48.)

41.     Defendants told many other lies to pool participants in furtherance of their

fraudulent scheme.  For example, when Investor 2 asked for the return of a portion of her funds

in late 2016 or early 2017, pursuant to her three-month investment agreement with

Algointeractive dated September 1, 2016, Defaulting Defendants concocted an elaborate hoax to avoid repaying her. (Compl. ¶ 49.)

42.     Initially, in early 2017, Zecchini told Investor 2 that the return of her funds was being delayed due to anti-money-laundering policies newly implemented by NFA. He claimed that Defaulting Defendants were writing letters to NFA and were scheduled to meet with NFA to resolve the issue. Zecchini later told Investor 2 that, at a second meeting with NFA, Zecchini had been informed by NFA that Investor 2 was not an "accredited investor," that she had failed to pay taxes on interest she had received, and that it was a "violation" for her to have entered into a three-month investment contract in addition to one-year agreements she had previously made with Algointeractive. None of this was true. (Compl. ¶ 50.)

43.     Next, Zecchini thereafter falsely told Investor 2 that her funds had been frozen because Algointeractive had to pay a fine to NFA. After Investor 2 requested documentation of the fine, on March 9, 2017 Algointeractive sent Investor 2 a two-page document that Algointeractive represented to Investor 2 was a letter from NFA, but in reality was a forgery. The undated letter contained the subject line "Request for Information Regarding Algo interactive (CTA)KEVIN P WHYLIE [sic]," but no salutation, and ended with the signature of an individual who was actually an executive of CME Group, not NFA. (Compl. ¶ 51.)

44.     Defaulting Defendants, including Zecchini, later met with Investor 2 at Algointeractive's office, where they repeated to her the false story that NFA had frozen her assets. (Compl. ¶ 52.)

45.     Even after Algointeractive's participants learned, in August 2017, of allegations from Former CTO that the firm had misappropriated their funds, Defaulting Defendants continued to lie to participants in an attempt to perpetuate their fraud. (Compl. ¶ 54.)

14

46.     In an August 7, 2017 email to participants, Former CTO stated accurately that, at the time of his departure from the firm in November 2016, Algointeractive had only received $150,000 total from just two investors; that pool participants' funds had been misappropriated by Defendants to pay various unauthorized expenses; that Defendants may have provided pool participants with altered account statements; and that Zecchini had falsely told one pool participant (Investor 2) that Algointeractive could not return her investment because her funds had been frozen.  (Compl. ¶ 55.)

47.     On August 8, 2017, Investor 1 forwarded Former CTO's email to Zecchini, noting to Zecchini that Investor 1 had previously requested but had not received disbursement of over $82,000 in Investor 1's account (which Investor 1 noted should be available based on a June 2017 statement provided to Investor 1 purporting to show an account balance for Investor 1 of over $92,000), and asking Zecchini to confirm his assurances to Investor 1 that his funds would be immediately returned.  In an effort to perpetuate the fraud, Zecchini falsely responded to Investor 1 that Former CTO's allegations were "very shocking" and that Former CTO was "a complete liar" making "unsubstantiated claims with zero evidence whatsoever."  (Compl. ¶ 56.)

48.     On August 9, 2017, in an email to Investor 3, who had also received Former CTO's email, Zecchini, in an effort to perpetuate the fraud, accused Former CTO of misconduct and falsely dismissed him as a bitter former employee engaged in "scare tactics" and "allegations without any evidence what so ever."  (Compl. ¶ 57.)

49.     Only after Investor 1 demanded, on August 11, 2017, to see a current statement of his account with Algointeractive, did Zecchini finally begin to acknowledge the truth.  On August 12, 2017, Zecchini emailed Investor 1: "I feel like my life is falling apart right now. . . . I'm doing my best to deal with everything but it's so overwhelming."  On August 14, 2017, after

Investor 1 had declined Zecchini's invitation to meet in person, Zecchini responded by email: "I feel horrible to put you in a position like this. . . . I realize that you are angry. I've lost absolutely everything." (Compl. ¶ 58.)

**F.      Commingling of Funds and Failure to Register**

50.      Defaulting Defendants, while operating Algointeractive as a CPO, failed to operate their commodity pool as a legal entity separate from Algointeractive, received pool funds in the wrong name (i.e., in the name of Algointeractive), commingled pool funds with non-pool property, and failed to register with the Commission. (Compl. ¶ 59.)

51.      During the Relevant Period, Defaulting Defendants, by and through their officers, employees or agents, used the mails, emails, wire transfers, websites, and other means or instrumentalities of interstate commerce, to solicit participants. (Compl. ¶ 60.)

52.      Algointeractive was never registered as a CPO. During the Relevant Period, Algointeractive acted as a CPO by engaging in a business that is of the nature of a commodity pool and, in connection with that business, soliciting, receiving, or accepting pool funds from participants for the purpose of trading in commodity interests. (Compl. ¶ 61.)

53.      During the Relevant Period, prior to approximately June 30, 2016, and again after March 1, 2017, Algointeractive acted as a CPO without registering as a CPO or claiming exemption from registration. Defaulting Defendants provided subscription agreements to pool participants both prior to June 30, 2016 and after March 1, 2017. (Compl. ¶ 62.)

54.      On or about June 30, 2016, Algointeractive filed a notice with NFA claiming to be exempt from registration as a CPO. The notice represented that Algointeractive was a CPO operating one exempt commodity pool, and that the name of the pool was "Matthew Zecchini." (Compl. ¶ 63.)

55.     On or about July 7, 2016, FCM 1 informed Zecchini by email that because a CPO
is required to operate a pool as an entity separate from the CPO, and because Algointeractive's
Futures Trading Account was in the name of Algointeractive, it was therefore improper for
Defendants to have identified Algointeractive to NFA as a CPO claiming to be exempt from
registration.  FCM 1 suggested that Zecchini should withdraw the notice of exemption as having
been filed in error and file a new notice identifying himself as a CPO and Algointeractive as his
pool.  (Compl. ¶ 64.)

56.     Defaulting Defendants did not take any action to correct the notice of exemption.
Instead, Defaulting Defendants continued to solicit and accept participant funds to be deposited
in accounts in the name of the entity claiming to be an exempt CPO, i.e., Algointeractive.
(Compl. ¶ 65.)

57.     Defaulting Defendants did not affirm their notices of exemption within 60 days of
the end of the year 2016, which caused their claimed exemptions to be deemed withdrawn by
NFA, effective March 2, 2017.  (Compl. ¶ 66.)

58.     Prior to delivering subscription agreements to participants during the Relevant
Period, Defaulting Defendants did not deliver to them any written statement that Algointeractive
was exempt from registration as a CPO and therefore need not provide a disclosure document or
certified annual report; nor did Defaulting Defendants provide to participants any description of
criteria pursuant to which Algointeractive qualified for exemption from registration.  (Compl.
¶ 67.)

59.     As a result, Algointeractive was not eligible for the CPO registration exemption
for which its notice of exemption was filed, and Algointeractive was required to register as a
CPO notwithstanding the notice of exemption filed with NFA.  (Compl. ¶ 68.)

60.     Zecchini acted as an AP of a CPO by, in his capacity as partner, officer, employee, consultant, or agent of the CPO (Algointeractive), soliciting or supervising the solicitation of funds for participation in Algointeractive's pool, but he never registered with the Commission as such.  (Compl. ¶ 69.)

61.     Defendants' misappropriation of pool participants' funds, as detailed above, involved the commingling of pool property with their own property.  Zecchini deposited his own funds in the Algointeractive bank accounts that were used to hold pool participant funds, and Zecchini used those bank accounts to pay personal or other unauthorized expenses.  Defaulting Defendants also transferred money from Algointeractive's bank accounts into existing personal bank accounts of Algointeractive's officers, including Zecchini's personal bank account, again mixing pool property with their own property.  (Compl. ¶ 70.)

**G.     Controlling Person Liability**

62.     Throughout the Relevant Period, Zecchini was chief executive officer, chairman of the board of directors, and a principal of Algointeractive.  (Compl. ¶ 71.)

63.     Throughout the Relevant Period, Zecchini, in his capacity as an officer, principal, and director of Algointeractive, directed and controlled all solicitations of participants.  Although others took part in preparing materials used for solicitations and in communicating with participants, in all cases Algointeractive's principals, including Zecchini, supervised these individuals and dictated the content of the materials and substance of the representations about Algointeractive that were made to the participants.  (Compl. ¶ 72.)

64.     During the Relevant Period, Zecchini was an authorized signer on, and therefore had access to and control over, Algointeractive's bank accounts, and also was an authorized trader with control over the Futures Trading Account and Algointeractive's online stock brokerage account. (Compl. ¶ 73.)

65.     During the Relevant Period, Zecchini did not act in good faith or knowingly

induced Algointeractive and its officers, employees, or agents' violations of the Act and

Regulations, by personally making or directing others to make the misrepresentations and

omissions described above to participants, misappropriating or causing Algointeractive to

misappropriate participants' funds, and operating or causing Algointeractive to commingle

participants' funds and operate Algointeractive without proper registration.  (Compl. ¶ 74.)

66.     Zecchini knew or recklessly disregarded the fact that Algointeractive and its

officers, employees, or agents were making fraudulent solicitations and misrepresentations to

participants, that participants were being given false account statements, that Defaulting

Defendants were misappropriating pool participant funds, and that Defaulting Defendants were

commingling participants' funds and operating Algointeractive without proper registration.

Zecchini failed to remove or correct the misrepresentations and failed to disclose the

misappropriation of pool participant funds.  (Compl. ¶ 75.)

**H.     Investor Losses Proximately Caused by Defaulting Defendants' Fraud**

67.     To date, none of the four participants in Defaulting Defendants' purported hedge

fund has been fully repaid in respect of their investments with Defaulting Defendants.  Investor 2

has received back $29,450; Investor 3 has received back $30,000; and Investor 1 and Investor 4

have not received back any funds.  In total, participants have received back a total of $59,450 in

respect of their investments with Defaulting Defendants, and thus have suffered losses totaling

$240,550 as result of Defaulting Defendants' fraud.  (Kokal Decl. ¶ 6.)

### III.     CONCLUSIONS OF LAW

**A.     Jurisdiction and Venue**

1.     This Court has jurisdiction over this action pursuant to Section 6c of the Act,

7 U.S.C. § 13a-1 (2012), which provides that whenever it shall appear to the Commission that

19

any person has engaged, is engaging, or is about to engage in any act or practice constituting a

violation of any provision of the Act or any rule, regulation, or order promulgated thereunder, the

Commission may bring an action in the proper district court of the United States against such

person to enjoin such act or practice, or to enforce compliance with the Act, or any rule,

regulation or order thereunder.  This Court also has jurisdiction pursuant to 28 U.S.C. § 1331

(2012) (federal question) and 28 U.S.C. § 1345 (2012) (United States as plaintiff).

2.      Venue properly lies with this Court pursuant to 7 U.S.C. § 13a-1(e), because the

acts and practices in violation of the Act occurred within this District.

**B.      Defaulting Defendants Committed Fraud in Connection with
        Futures Contracts in Violation of 7 U.S.C. § 6b(a)(1)(A)-(C)**

3.      Section 4b(a)(1)(A)-(C) of the Act, 7 U.S.C. § 6b(a)(1)(A)-(C) (2012), makes it

unlawful:

> [F]or any person, in or in connection with any order to make, or
> the making of, any contract of sale of any commodity in interstate
> commerce or for future delivery that is made, or to be made, on or
> subject to the rules of a designated contract market, for or on
> behalf of any other person . . . (A) to cheat or defraud or attempt to
> cheat or defraud the other person; (B) willfully to make or cause to
> be made to the other person any false report or statement or
> willfully to enter or cause to be entered for the other person any
> false record; [or] (C) willfully to deceive or attempt to deceive the
> other person by any means whatsoever in regard to any order or
> contract or the disposition or execution of any order or contract, or
> in regard to any act of agency performed, with respect to an order
> or contract for . . . the other person . . . .

4.      Defaulting Defendants violated 7 U.S.C. § 6b(a)(1)(A)-(C) by willfully or

recklessly making false representations and omissions or otherwise defrauding participants,

including but not limited to by: (1) misrepresenting to participants that all or substantially all of

participants' funds would be pooled and used to invest in, among other things, futures contracts

for the benefit of participants; (2) misrepresenting to participants Defendants' background,

experience, and track record, the number of participants in Algointeractive's pool, and the amount of assets under management by Defendants; (3) sending participants false account statements and other documents that inflated and misrepresented the value of their accounts and the pool's trading returns; (4) misrepresenting to one participant that her funds were unavailable for withdrawal due to actions taken by NFA or government authorities; and (5) misappropriating participants' funds for unauthorized personal or business expenses rather than investing for the benefit of participants, and failing to disclose that participants' funds had been misappropriated.

5.     Zecchini held and exercised direct and indirect control over Algointeractive and either did not act in good faith or knowingly induced Algointeractive's violations of 7 U.S.C. § 6b(a)(1)(A)-(C).  As a controlling person of Algointeractive, Zecchini is liable for Algointeractive's violations of 7 U.S.C. § 6b(a)(1)(A)-(C), pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b) (2012).

**C.     Defaulting Defendants Committed CPO Fraud in Violation of 7 U.S.C. § 6*o*(1)**

6.     During the Relevant Period, Algointeractive acted as a CPO, as defined by Section 1a(11) of the Act, 7 U.S.C. § 1a(11) (2012), in that it engaged in a business that is of the nature of an investment trust, syndicate, or similar form of enterprise, operated for the purpose of trading in commodity interests and, in connection therewith, solicited, accepted, or received from others, funds, securities, or property, either directly or through capital contributions, the sale of stock or other forms of securities, or otherwise, for the purpose of trading in commodity interests, including, in relevant part, commodities for future delivery.

7.     An AP of a CPO is defined by Regulation 1.3(aa)(3), 17 C.F.R. § 1.3(aa)(3) (2018), as any person who is associated with a CPO as a partner, officer, employee, consultant, or agent (or any natural person occupying a similar status or performing similar functions), in any capacity which involves (i) the solicitation of funds, securities, or property for a participation

in a commodity pool or (ii) the supervision of any person or persons so engaged.  During the

Relevant Period, Zecchini acted as an AP of Algointeractive, in that he solicited funds for

Algointeractive's pool and supervised other officers, employees, and agents of Algointeractive

who solicited funds for Algointeractive's pool.

8.      Section 4o(1) of the Act, 7 U.S.C. § 6o(1) (2012), prohibits CPOs and APs of

CPOs, whether registered with the Commission or not, from using the mails or any means or

instrumentality of interstate commerce, directly or indirectly, to employ devices, schemes or

artifices to defraud any client or participant or prospective client or participant, or to engage in

transactions, practices, or courses of business which operate as a fraud or deceit upon any client

or participant or prospective client or participant.

9.      While acting in its capacity as a CPO, Algointeractive, by and through its officers,

employees, and agents, violated 7 U.S.C. § 6o(1), by willfully or recklessly making false

representations and omissions or otherwise defrauding participants or engaging in conduct that

operated as a fraud or deceit on participants, including but not limited to by:  (1) misrepresenting

to participants that all or substantially all of participants' funds would be pooled and used to

invest in, among other things, futures contracts for the benefit of participants; (2)

misrepresenting to participants Defendants' background, experience, and track record, the

number of participants in Algointeractive's pool, and the amount of assets under management by

Defendants; (3) sending participants false account statements and other documents that inflated

and misrepresented the value of their accounts and the pool's trading returns; (4) misrepresenting

to one participant that her funds were unavailable for withdrawal due to actions taken by NFA or

government authorities; and (5) misappropriating pool participants' funds for unauthorized

personal or business expenses rather than investing for the benefit of participants, and failing to
disclose that participants' funds had been misappropriated.

10.     Zecchini directly violated 7 U.S.C. § 6o(1)(A)-(B), while acting in his capacity as
an AP of Algointeractive, by willfully or recklessly making false representations and omissions
or otherwise defrauding participants or engaging in conduct that operated as a fraud or deceit on
participants, including but not limited to by:  (1) misrepresenting to participants that all or
substantially all of participants' funds would be pooled and used to invest in, among other things,
futures contracts for the benefit of participants; (2) misrepresenting to participants Defendants'
background, experience, and track record, the number of participants in Algointeractive's pool,
and the amount of assets under management by Defendants; (3) sending participants false
account statements and other documents that inflated and misrepresented the value of their
accounts and the pool's trading returns; (4) misrepresenting to one participant that her funds
were unavailable for withdrawal due to actions taken by NFA or government authorities; and (5)
misappropriating participants' funds for unauthorized personal or business expenses rather than
investing for the benefit of participants, and failing to disclose that participants' funds had been
misappropriated.

11.     Zecchini held and exercised direct and indirect control over Algointeractive and
either did not act in good faith or knowingly induced Algointeractive's violations of 7 U.S.C.
§ 6o(1)(A)-(B).  As a controlling person of Algointeractive, Zecchini is liable for
Algointeractive's violations of 7 U.S.C. § 6o(1)(A)-(B), pursuant to 7 U.S.C. § 13c(b).

**D.     Defaulting Defendants Engaged in False Advertising and Failed to Include
Hypothetical Disclaimer in Violation of 17 C.F.R. § 4.41(a)-(b)**

12.     Regulation 4.41(a), 17 C.F.R. § 4.41(a) (2018), prohibits CPOs and their
principals from advertising in a manner that employs any device, scheme or artifice to defraud

any participant or client or prospective participant or client, or involves any transaction, practice

or course of business which operates as a fraud or deceit upon any participant or client or any

prospective participant or client.

     13.    Regulation 4.41(b), 17 C.F.R. § 4.41(b) (2018), prohibits any person from

presenting the performance of any simulated or hypothetical commodity interest account,

transaction in a commodity interest or series of transactions in a commodity interest of a

commodity pool operator, commodity trading advisor, or any principal thereof, unless such

performance is accompanied either by a statement prescribed by a registered futures association

or by the following statement:

> These results are based on simulated or hypothetical performance
> results that have certain inherent limitations.  Unlike the results
> shown in an actual performance record, these results do not
> represent actual trading.  Also, because these trades have not
> actually been executed, these results may have under-or over-
> compensated for the impact, if any, of certain market factors, such
> as lack of liquidity.  Simulated or hypothetical trading programs in
> general are also subject to the fact that they are designed with the
> benefit of hindsight.  No representation is being made that any
> account will or is likely to achieve profits or losses similar to these
> being shown.

     14.    During the Relevant Period, while acting in its capacity as a CPO,

Algointeractive, by and through its officers, employees, and agents, advertised using

misrepresentations about, among other things, Defendants' background, experience, and track

record, the number of participants in Algointeractive's pool, and the amount of assets under

management by Defendants, as well as misrepresentations that all or substantially all of

participants' funds would be pooled and used to invest for the benefit of participants.  Therefore,

Algointeractive violated 17 C.F.R. § 4.41(a).

     15.    Zecchini directly violated 17 C.F.R. § 4.41(a) while acting in his capacity as a

principal of Algointeractive, by advertising using misrepresentations about, among other things,

Defendants' background, experience, and track record, the number of participants in

Algointeractive's pool, and the amount of assets under management by Defendants, as well as

misrepresentations that all or substantially all of participants' funds would be pooled and used to

invest for the benefit of participants.

16.     During the Relevant Period, Defaulting Defendants, by and through their officers,

employees, and agents, presented in written advertising statements about simulated or

hypothetical commodity interest trading results achieved by Defendants that were not

accompanied by any statement prescribed in 17 C.F.R. § 4.41(b).  Therefore, Defaulting

Defendants violated 17 C.F.R. § 4.41(b).

17.     Zecchini held and exercised direct and indirect control over Algointeractive and

either did not act in good faith or knowingly induced Algointeractive's violations of 17 C.F.R.

§ 4.41(a)-(b).  As a controlling person of Algointeractive, Zecchini is liable for Algointeractive's

violations of 17 C.F.R. § 4.41(a)-(b), pursuant to 7 U.S.C. § 13c(b) (2012).

**E.     Defaulting Defendants Failed to Register as a CPO and as an AP
        of the CPO in Violation of 7 U.S.C. §§ 6k(2) and 6m(1)**

18.     Section 4m(1) of the Act, 7 U.S.C § 6m(1) (2012), makes it unlawful for any CPO

(subject to certain specified exceptions and exemptions, not applicable here), unless registered

with the Commission, to make use of the mails or any means or instrumentality of interstate

commerce in connection with its business as a CPO.

19.     Section 4k(2) of the Act, 7 U.S.C § 6k(2) (2012), requires all APs of CPOs

(subject to certain specified exceptions and exemptions, not applicable here) to be registered with

the Commission.

20.     During the Relevant Period, Algointeractive claimed exemption from registration as a CPO only from June 30, 2016 until March 2, 2017, and did so only pursuant to Regulation 4.13(a)(2), 17 C.F.R. § 4.13(a)(2) (2018).

21.     Both prior to filing its notice of claimed exemption on or around June 30, 2016 and after its notice of claimed exemption was withdrawn by NFA on or around March 2, 2017, Algointeractive operated as a CPO by soliciting, accepting, or receiving funds from participants for the purpose of trading commodity futures contracts.

22.     Moreover, despite Algointeractive's claim that it was exempt from CPO registration requirements, at no time during the Relevant Period was Algointeractive eligible for exemption from registration under 17 C.F.R. § 4.13(a)(2), because prior to receiving subscription agreements Algointeractive's participants never received (a) any written statement that Algointeractive was exempt from registration as a CPO and therefore need not provide a disclosure document or certified annual report or (b) any description of criteria pursuant to which Algointeractive qualified for exemption from registration, as required by 17 C.F.R. § 4.13(a)(6)(i)-(ii).

23.     Likewise, at no time during the Relevant Period was Zecchini eligible, pursuant to Regulation 3.12(h)(3)(ii), 17 C.F.R. § 3.12(h)(3)(ii) (2018), for exemption from the requirement to register as an AP of a CPO.

24.     During the Relevant Period, Algointeractive, while using the mails or means of interstate commerce (including email) in connection with its business as a CPO, was not registered with the Commission as a CPO.  Thus, Algointeractive acted as an unregistered CPO in violation of 7 U.S.C § 6m(1).

25.     During the Relevant Period, Zecchini acted as an AP of Algointeractive without registering with the Commission as an AP of a CPO.  Thus, Zecchini acted as an unregistered AP of a CPO in violation of 7 U.S.C § 6k(2).

26.     Zecchini held and exercised direct and indirect control over Algointeractive and either did not act in good faith or knowingly induced Algointeractive's violations of 7 U.S.C. § 6m(1).  As a controlling person of Algointeractive, Zecchini is liable for Algointeractive's violations of 7 U.S.C. § 6m(1), pursuant to 7 U.S.C. § 13c(b).

**F.      Defaulting Defendants Failed to Operate Pool as Separate Entity, Failed to Receive Pool Participant Funds in Pool's Name, and Commingled Pool Funds in in Violation of 17 C.F.R. § 4.20(a)-(c)**

27.     Regulation 4.20(a), 17 C.F.R. § 4.20(a) (2018), requires a CPO, whether registered or not, to operate its commodity pool as an entity cognizable as a legal entity separate from the CPO.

28.     Regulation 4.20(b), 17 C.F.R. § 4.20(b) (2018), prohibits CPOs, whether registered or not, from receiving pool participants' funds in any name other than that of the pool.

29.     Regulation 4.20(c), 17 C.F.R. § 4.20(c) (2018), prohibits a CPO, whether registered or not, from commingling the property of any pool it operates with the property of any other person.

30.     During the Relevant Period, Algointeractive, while acting as a CPO, violated 17 C.F.R. § 4.20(a)-(c) by: (1) failing to operate its commodity pool as a legal entity separate from Algointeractive; (2) failing to receive pool participants' funds in the name of a pool that was a legal entity separate from itself; and (3) commingling the property of the pool with property of Defendants or others.

31.     Zecchini held and exercised direct and indirect control over Algointeractive and either did not act in good faith or knowingly induced Algointeractive's violations of 17 C.F.R.

27

§ 4.20(a)-(c).  As a controlling person of Algointeractive, Zecchini is liable for Algointeractive's

violations of 17 C.F.R. § 4.20(a)-(c), pursuant to 7 U.S.C. § 13c(b).

## IV.    PERMANENT INJUNCTION

**IT IS HEREBY ORDERED THAT:**

1.      Based on and in connection with the foregoing conduct, pursuant to Section 6c of

the Act, 7 U.S.C. § 13a-1 (2012), Algointeractive is permanently restrained, enjoined and

prohibited from directly or indirectly engaging in conduct in violation of Sections 4b(a)(1)(A)-

(C), 4m(1), and 4o(1)(A)-(B) of the Act, 7 U.S.C. §§ 6b(a)(1)(A)-(C), 6m(1), 6o(1)(A)-(B)

(2012), and Regulations 4.20(a)-(c) and 4.41(a)-(b), 17 C.F.R. §§ 4.20(a)-(c), 4.41(a)-(b) (2018).

2.      Based on and in connection with the foregoing conduct, pursuant to Section 6c of

the Act, 7 U.S.C. § 13a-1, Zecchini is permanently restrained, enjoined and prohibited from

directly or indirectly engaging in conduct in violation of 7 U.S.C. §§ 6b(a)(1)(A)-(C), 6k(2),

6m(1), 6o(1)(A)-(B), and 17 C.F.R. §§ 4.20(a)-(c), 4.41(a)-(b).

3.      Defaulting Defendants are permanently restrained, enjoined and prohibited from

directly or indirectly:

      a.      Trading on or subject to the rules of any registered entity (as that term is

            defined by Section 1a(40) of the Act, 7 U.S.C. § 1a(40) (2012));

      b.      Entering into any transactions involving "commodity interests" (as that

            term is defined in Regulation 1.3, 17 C.F.R. § 1.3 (2018)), for accounts

            held in the name of any Defaulting Defendant or for accounts in which

            any Defaulting Defendant has a direct or indirect interest;

      c.      Having any commodity interests traded on any Defaulting Defendant's

            behalf;

d.   Controlling or directing the trading for or on behalf of any other person or entity, whether by power of attorney or otherwise, in any account involving commodity interests;

e.   Soliciting, receiving, or accepting any funds from any person for the purpose of purchasing or selling of any commodity interests;

f.   Applying for registration or claiming exemption from registration with the Commission in any capacity, and engaging in any activity requiring such registration or exemption from registration with the Commission except as provided for in Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9) (2018); and

g.   Acting as a principal (as that term is defined in Regulation 3.1(a), 17 C.F.R. § 3.1(a) (2018)), agent, or any other officer or employee of any person registered, exempted from registration, or required to be registered with the Commission except as provided for in 17 C.F.R. § 4.14(a)(9).

## V.     RESTITUTION AND CIVIL MONETARY PENALTY

**IT IS FURTHER ORDERED THAT:**

**A.     Restitution**

1.     Pursuant to Section 6c(d)(3)(A) of the CEA, 7 U.S.C. § 13a-1(d)(3)(A) (2012), Algointeractive and Zecchini shall pay, jointly and severally, restitution in the amount of two hundred forty thousand five hundred fifty dollars ($240,550) (the "Restitution Obligation"). If the Restitution Obligation is not paid immediately, post-judgment interest shall accrue on the Restitution Obligation beginning on the date of entry of this Order and Default Judgment (this "Order") and shall be determined by using the Treasury Bill rate prevailing on the date of entry of this Order pursuant to 28 U.S.C. § 1961 (2012).

2.      To effect payment of the Restitution Obligation and the distribution of any

restitution payments to Defendants' customers, the Court appoints the National Futures

Association ("NFA") as Monitor ("Monitor").  The Monitor shall collect restitution payments

from Defaulting Defendants and make distributions as set forth below.  Because the Monitor is

acting as an officer of this Court in performing these services, NFA shall not be liable for any

action or inaction arising from NFA's appointment as Monitor, other than actions involving

fraud.

3.      Defaulting Defendants shall make Restitution Obligation payments, and any post-

judgment interest payments, under this Order to the Monitor in the name "Algointeractive

Inc/Kevin P. Whylie/Matthew James Zecchini – Restitution Fund" and shall send such

Restitution Obligation payments by electronic funds transfer, or by U.S. postal money order,

certified check, bank cashier's check, or bank money order, to the Office of Administration,

National Futures Association, 300 South Riverside Plaza, Suite 1800, Chicago, Illinois 60606

under cover letter that identifies the paying Defendants and the name and docket number of this

proceeding.  Defaulting Defendants shall simultaneously transmit copies of the cover letter and

the form of payment to the Chief Financial Officer, Commodity Futures Trading Commission,

Three Lafayette Centre, 1155 21st Street, NW, Washington, D.C. 20581.

4.      The Monitor shall oversee the Restitution Obligation and shall have the discretion

to determine the manner of distribution of such funds in an equitable fashion to Algointeractive's

pool participants identified by the Commission or may defer distribution until such time as the

Monitor deems appropriate.  In the event that the amount of Restitution Obligation payments to

the Monitor are of a de minimis nature such that the Monitor determines that the administrative

cost of making a distribution to eligible pool participants is impractical, the Monitor may, in its

discretion, treat such restitution payments as civil monetary penalty payments, which the

Monitor shall forward to the Commission following the instructions for civil monetary penalty

payments set forth in Section V.B below.

5.     Defaulting Defendants shall cooperate with the Monitor as appropriate to provide

such information as the Monitor deems necessary and appropriate to identify Algointeractive's

pool participants to whom the Monitor, in its sole discretion, may determine to include in any

plan for distribution of any Restitution Obligation payments.  Defaulting Defendants shall

execute any documents necessary to release funds that they have in any repository, bank,

investment or other financial institution, wherever located, in order to make partial or total

payment toward the Restitution Obligation.

6.     The Monitor shall provide the Commission at the beginning of each calendar year

with a report detailing the disbursement of funds to Algointeractive's pool participants during the

previous year.  The Monitor shall transmit this report under a cover letter that identifies the name

and docket number of this proceeding to the Chief Financial Officer, Commodity Futures

Trading Commission, Three Lafayette Centre, 1155 21st Street, NW, Washington, D.C. 20581,

and R. Stephen Painter, Jr., Chief Trial Attorney, Commodity Futures Trading Commission, 140

Broadway, 19th Floor, New York, NY 10005.

7.     The amounts payable to each pool participant shall not limit the ability of any

pool participant from proving that a greater amount is owed from Defaulting Defendants or any

other person or entity, and nothing herein shall be construed in any way to limit or abridge the

rights of any customer that exist under state or common law.

8.     Pursuant to FRCP 71, each pool participant who suffered a loss is explicitly made

an intended third-party beneficiary of this Order and may seek to enforce obedience of this Order

to obtain satisfaction of any portion of the restitution that has not been paid by Defaulting

Defendants to ensure continued compliance with any provision of this Order and to hold

Defaulting Defendants in contempt for any violations of any provision of this Order.

9.      To the extent that any funds accrue to the U.S. Treasury for satisfaction of

Defaulting Defendants' Restitution Obligation, such funds shall be transferred to the Monitor for

disbursement in accordance with the procedures set forth above.

10.     Defaulting Defendants will obtain a dollar-for-dollar credit against this

Restitution Obligation as a result of any restitution payments made in this case by Defendant

Whylie.

**B.      Civil Monetary Penalty**

11.     Pursuant to Section 6c(d)(1)(A) of the CEA, 7 U.S.C. § 13a-1(d)(1)(A) (2012),

Algointeractive and Zecchini shall, jointly and severally, pay a civil monetary penalty in the

amount of seven hundred twenty-one thousand six hundred fifty dollars ($721,650) (the "CMP

Obligation"), which is equivalent to triple the monetary gain to Defaulting Defendants from their

violations—i.e., three times the gross amount of pool participant funds obtained by Defaulting

Defendants less the amount of funds returned to pool participants.  If the CMP Obligation is not

paid immediately, then post-judgment interest shall accrue on the CMP Obligation beginning on

the date of entry of this Order and shall be determined by using the Treasury Bill rate prevailing

on the date of entry of this Order pursuant to 28 U.S.C. § 1961.

12.     Defaulting Defendants shall pay their CMP Obligation by electronic funds

transfer, U.S. postal money order, certified check, bank cashier's check, or bank money order.  If

payment is to be made other than by electronic funds transfer, then the payment shall be made

payable to the Commodity Futures Trading Commission and sent to the address below:

MMAC/ESC/AMK326
Commodity Futures Trading Commission
Division of Enforcement
6500 S. MacArthur Blvd.
HQ Room 181
Oklahoma City, OK 73169
(405) 954-6569 office
(405) 954-1620 fax
9-AMC-AR-CFTC@faa.gov

If payment by electronic funds transfer is chosen, Defaulting Defendants shall contact Marie

Thorne or her successor at the address above to receive payment instructions and shall fully

comply with those instructions. Defaulting Defendants shall accompany payment of the CMP

Obligation with a cover letter that identifies the paying Defaulting Defendant and the name and

docket number of this proceeding. Defaulting Defendants shall simultaneously transmit copies

of the cover letter and the form of payment to the Chief Financial Officer, Commodity Futures

Trading Commission, Three Lafayette Centre, 1155 21st Street, NW, Washington, D.C. 20581,

and R. Stephen Painter, Jr., Chief Trial Attorney, Commodity Futures Trading Commission, 140

Broadway, 19th Floor, New York, NY 10005.

## VI. MISCELLANEOUS PROVISIONS

**IT IS FURTHER ORDERED THAT:**

1.      Acceptance by the Commission or the Monitor of any partial payment of

Defaulting Defendants' Restitution Obligation or CMP Obligation shall not be deemed a waiver

of their obligation to make further payments pursuant to this Order, or a waiver of the

Commission's right to seek to compel payment of any remaining balance.

2.      The injunctive and equitable relief provisions of this Order shall be binding upon

Defaulting Defendants, upon any person under the authority or control of any Defaulting

Defendant, and upon any person who receives actual notice of this Order, by personal service,

email, facsimile or otherwise insofar as he or she is acting in active concert or participation with

Defaulting Defendants.

3.      All notices required to be given by any provision in this Order shall be sent

certified mail, return receipt requested, as follows:

Notice to Commission:

Manal M. Sultan
Deputy Director
Division of Enforcement
Commodity Futures Trading Commission
140 Broadway, 19th Floor
New York, NY 10005

Notice to Monitor:

Daniel Driscoll
Executive Vice President, COO
National Futures Association
300 South Riverside Plaza, Suite 1800
Chicago, Illinois 60606-3447

All such notices to the Commission or the Monitor shall reference the name and docket number

of this action.

4.      Until such time as Defaulting Defendants satisfy in full their Restitution

Obligation and CMP Obligation as set forth in this Order, Defaulting Defendants shall provide

written notice to the Commission by certified mail of any change to their telephone number and

mailing address within ten calendar days of the change.

5.      If any provision of this Order or if the application of any provision or

circumstance is held invalid, then the remainder of this Order and the application of the provision

to any other person or circumstance shall not be affected by the holding.

34

## VII.   CONTINUING JURISDICTION OF THIS COURT

**IT IS FURTHER ORDERED THAT:**

This Court shall retain jurisdiction of this action to ensure compliance with this Order and for all other purposes related to this action, including any motion by Defaulting Defendants to modify, or for relief from, the terms of this Order.

**IT IS SO ORDERED.**

Date: _November 13_, 2018

Loretta A. Preska
United States District Judge